**Varnall WEEKS, Petitioner–Appellant,**

v.

**Charlie E. JONES, Warden, Holman State Prison, James H. Evans, Attorney General for the State of Alabama, Respondents–Appellees.**

No. 92–7110.

United States Court of Appeals, Eleventh Circuit.

July 11, 1994.

James C. McMillin, Valerie Amsterdam, New York City, for appellant.

J. Clayton Crenshaw, Asst. Atty. Gen., Montgomery, AL, for appellees.

Before KRAVITCH, COX and BIRCH, Circuit Judges.

BIRCH, Circuit Judge:

In this habeas corpus appeal, the petitioner raises issues of ineffective assistance of counsel, exculpatory evidence, and the failure to accord expert assistance. The district court determined that all of these claims were without merit or procedurally barred. We AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On October 1, 1981, petitioner Varnall Weeks abducted Mark Anthony Batts, a Tuskegee Institute veterinary student, robbed him of his car, tied his feet and hands

together, placed a pillowcase over his head, and shot and killed Batts with a pistol fired at close range. Weeks buried the body in a shallow grave approximately 100 feet from Weeks's residence. Armed, Weeks then took Batts's car and fled to Ohio with his brother Chenoy Weeks and a woman. During the flight in Batts's car, Weeks was stopped for a traffic violation by an East Cleveland, Ohio, policeman, who asked Weeks for his driver's license. Weeks gave him Batts's license. While the officer was patting Weeks down, Weeks drew the gun used to kill Batts and shot the policeman.

Subsequently, Weeks was apprehended, arrested by the East Cleveland police, and returned by Ohio authorities to Alabama, where capital murder charges were pending. Weeks was indicted in Alabama for the murder of Batts during the course of a first-degree robbery, a capital offense. Ala.Code § 13A–5–40(a)(2) (1975). The attorney appointed to represent Weeks, Jacob "Jock" Smith, had never represented a client charged with a capital offense.[1]

During Weeks's trial, the jury was confronted with incriminating direct and circumstantial evidence. Weeks was arrested in East Cleveland in possession of an automobile and driver's license that belonged to the murder victim Batts. When stopped by an East Cleveland policeman for a traffic violation, Weeks shot the officer with a gun that ballistics evidence proved to be the same weapon that killed Batts. Weeks's thumbprint was found on a bullet inside the gun.

Two eyewitnesses identified Weeks as being in front of Batts's home on the morning that the victim was last seen alive. Weeks's female passenger testified that she found Batts's driver's license in the glove compartment and questioned Weeks as to whom it belonged. Weeks told her that he had killed a Tuskegee Institute student for his car and had buried him in Weeks's backyard. Batts was found buried in a shallow grave in Weeks's backyard. Weeks and Batts's fingerprints were found on notebooks located near Batts's body.

A jury convicted Weeks for capital murder committed during first-degree robbery. Weeks waived the participation of the jury in the sentencing phase and demanded that the judge sentence him to death. The judge held a sentencing hearing at which he found two aggravating[2] and no mitigating circumstances. Weeks was sentenced to death.

On direct review, Weeks's conviction and death sentence were affirmed. *Weeks v. State,* 456 So.2d 395 (Ala.Crim.App.1983), *aff'd sub nom., Ex parte Weeks,* 456 So.2d 404 (Ala.1984), *cert. denied,* 471 U.S. 1030, 105 S.Ct. 2051, 85 L.Ed.2d 324 (1985). Weeks then instituted state collateral proceedings by filing a petition for writ of error coram nobis in Macon County Circuit Court, where he was convicted and sentenced. Following an evidentiary hearing, the court denied the petition, and the denial was affirmed by the Alabama Court of Criminal Appeals. *Weeks v. State,* 568 So.2d 864 (Ala.Crim.App. 1989), *cert. denied,* 498 U.S. 882, 111 S.Ct. 230, 112 L.Ed.2d 184 (1990). The Alabama Supreme Court and the United States Supreme Court denied certiorari. *Weeks v. State,* No. 89–437 (Ala. Feb. 23, 1990), *cert. denied,* 498 U.S. 882, 111 S.Ct. 230, 112 L.Ed.2d 184 (1990).

Weeks then petitioned the federal district court for the Middle District of Alabama for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On November 25, 1992, the district court denied the petition with prejudice. The district court found that Weeks was either procedurally barred or not entitled to relief on the twenty grounds that he raised. The district court also granted Weeks's motion for a certificate of probable cause to appeal to our court, and this appeal followed.

## II. DISCUSSION

"In reviewing a petition filed under 28 U.S.C. § 2254, we presume that factual findings made by a state court are correct. We

---

1. Smith graduated from the University of Notre Dame Law School, then worked for the Alabama Office of the Attorney General for three years doing criminal appellate work exclusively. Thereafter, he entered private practice in Macon County and had conducted approximately fifteen civil and criminal jury trials prior to Weeks's trial. At the time of Weeks's capital trial, sixty-five to seventy percent of Smith's time was spent on criminal defense work. Also at the time of Weeks's trial, Smith had attended seminars on criminal defense for death-penalty cases conducted by the Southern Poverty Law Center in Montgomery, Alabama.

2. The aggravating circumstances found by the court were that the murder was committed during the course of a robbery, and that the murder was especially heinous, atrocious or cruel compared with other capital offenses. *See* Ala.Code §§ 13A–5–49(4), (8).

review factual conclusions made by the district court under the clearly erroneous standard. We review mixed questions of fact and law *de novo.*" *Hamilton v. Ford,* 969 F.2d 1006, 1010 (11th Cir.1992) (citations and footnote omitted), *cert. denied,* —— U.S. ——, 113 S.Ct. 1625, 123 L.Ed.2d 183 (1993). On appeal, Weeks raises issues of ineffective assistance of counsel, failure of the district court to address exculpatory evidence, and failure to permit expert assistance. We analyze each of these claims.

## A. *Ineffective Assistance of Counsel*

### 1. Merits Review

 In district court, Weeks claimed that his counsel was ineffective for failing to discover and to present at trial evidence of Weeks's alleged mental illness, ground one, and for failing to request a psychiatric examination of Weeks after he was found guilty, but prior to his sentencing, ground two. Since these grounds were first alleged in Weeks's error coram nobis petition, they were preserved for federal habeas corpus review. Provided that the state court made its factual findings based upon a full and fair hearing where the facts were developed and the record fairly supports the state court's findings, we generally presume such factual findings to be correct. 28 U.S.C. § 2254(d); *see Amadeo v. Zant,* 486 U.S. 214, 223, 108 S.Ct. 1771, 1777, 100 L.Ed.2d 249 (1988) (court of appeals may not reverse if district court's account of the state court's factual findings is plausible based on the record viewed in its entirety). A habeas petition alleging ineffective assistance of counsel presents a mixed question of fact and law subject to *de novo* review. *Agan v. Singletary,* 12 F.3d 1012, 1017 (11th Cir.1994).

The mental history to which Weeks refers in ground one is his six-month commitment, commencing on November 21, 1974, to Bryce Hospital in Tuscaloosa, Alabama, for determination of his sanity prior to trial on charges of burglary, receiving stolen proper-

ty, and carrying a pistol. Although initial evaluations diagnosed Weeks as suffering from paranoid schizophrenia, on May 28, 1975, the Bryce Hospital Forensic Evaluation Board changed its diagnosis to "Schizophrenia, Paranoid Type in remission," and concluded that "[i]t is the unanimous professional opinion of the Board that Mr. Weeks is not presently suffering from a mental disorder of sufficient severity to preclude his taking part in his trial and effectively assisting his counselor in his own defense." R. Coram Nobis, Tab 40, at 77. The Bryce Hospital Superintendent informed the Macon County Court that Weeks was "restored to his right mind" and recommended that he be returned to that court to proceed with the pending criminal proceedings.[3] *Id.* at 104. Despite a plea of not guilty by reason of insanity, Weeks was tried, convicted of grand larceny, and sentenced to seven years of imprisonment.

Weeks faults his trial counsel in this capital case for not investigating or discovering his prior psychiatric commitment in connection with his previous trial for the grand larceny charge in 1974. Weeks specifically notes that the commitment was referenced in the reported appellate review of his conviction for this charge and that this case had been cited by the prosecution. *Weeks v. State,* 342 So.2d 1335, 1337 (Ala.Crim.App. 1977). While this reported decision does state that the record "indicate[ed]" that Weeks was taken to Bryce Hospital following his arrest, it also clarifies that the commitment petition, the court order, "and the findings of the doctors at Bryce Hospital are not in this record." *Id.*

The Bryce Hospital records were part of the record in Weeks's error coram nobis proceedings in this capital case. Additionally, the coram nobis court ordered that Weeks be examined at Taylor Hardin Secure Medical Facility prior to conducting an evidentiary hearing on his ineffective assistance of counsel claims, concerning his mental problems and his counsel's failure to raise an

---

3. On February 12, 1975, the Forensic Evaluation Board of Bryce Hospital initially diagnosed Weeks as suffering from "Schizophrenia, Paranoid Type." R. Corum Nobis, Tab 40, at 76. The Bryce Hospital Director informed the Macon County Circuit Court that Weeks was "suffering

from a major thought disorder of psychotic proportions and it is the opinion of the Board that he was incompetent and insane at the time of the alleged offense as well as presently." *Id.* at 110. The Director further noted that Weeks's condition "requires long-term treatment." *Id.*

insanity defense. Weeks was admitted to Taylor Hardin on August 26, 1986, and discharged on January 15, 1987. As to the subject murder, the Lunacy Commission concluded that Weeks was not suffering from psychological abnormalities when he allegedly committed the murder and that he was " 'not mentally defective or emotionally disturbed.' " [4] *Weeks*, 568 So.2d at 870 (quoting Lunacy Commission Report (Jan. 12, 1987)).

At the coram nobis hearing, Weeks's trial counsel testified that he attempted to locate evidence of Weeks's mental history by searching the records at the Office of the Macon County Probate Judge, which "is the primary vehicle where one is committed under some notions of being insane." Coram Nobis Hearing at 30. Weeks's attorney also searched the records in the Macon County Clerk's office. While these records confirmed that Weeks's brother had a history of mental illness, they did not indicate that Weeks had ever been committed for any type of psychiatric evaluation. In concluding that trial counsel was not ineffective in failing to locate any psychiatric records for Weeks, the coram nobis court additionally recognized the apparent problems involved with such record maintenance in Macon County at that time.[5]

Weeks's trial counsel testified further that

I interviewed Mr. Weeks a number of times ... [a]nd I asked him about his competency and his prior mental history. If my memory serves me correct, he informed me that he had no problems in the past. I said, well, I'm thinking about raising this issue. Varnall, in my opinion, was a very intelligent and opinionated young man. He stated to me with a great deal of zeal [that] under no circumstances was I to raise that issue, that he was competent, would stand trial, and was innocent. And we talked about that at length. And, based upon that discussion and based upon the discussion of the probate records and based upon the fact that his prior records, criminal record, was not available to me here at the Circuit Clerk's Office in Macon [C]ounty, I took him at his word that he had not had any prior medical—any sanity problems. I also did something else that I usually do. I made an observation of him. I spent a lot of time questioning him to determine myself whether there were any visible signs of a problem in the area of

---

4. In pertinent part, the Lunacy Commission evaluation report dated October 16, 1986, and prepared for the coram nobis court by staff psychiatrist Dr. Kamal A. Nagi is illuminating:

 It does not seem that Mr. Weeks' long-standing psychopathology is a product of mental disorder or mental defect but rather a product of a characterological disorder with consequences of academic underachievement and borderline intellectual functioning. Although Mr. Weeks' records show hospitalization in 1974 with a diagnosis of Paranoid Schizophrenia in Remission, it is possible that it was psychosis related to secondary use of illicit drugs.... The crime scenario in all of the alleged crimes does not indicate any relationship to mental disorder, defect or extreme retardation. In all of the alleged crimes committed, Mr. Weeks showed his full awareness that it was wrong and against the law to commit such an offense; however, he justified his criminal behavior by his rationalization in blaming society for his inadequacies. I do not believe that there were any mitigating circumstances involved during the alleged crime. My opinion is based upon my clinical findings and is advisory to the court.

 R. Coram Nobis, Tab 42, at 171–72.

 The final diagnosis that Weeks was not suffering from a thought disorder and that he had an antisocial personality is significant. Antisocial personality disorder has been held *not to be* mitigating as a matter of law. *Harris v. Pulley*, 885 F.2d 1354, 1383 (9th Cir.1988), *cert. denied*, 493 U.S. 1051, 110 S.Ct. 854, 107 L.Ed.2d 848 (1990).

 [I]t is difficult to suppose that there are any persons who commit the kind of vicious crime for which the death penalty is now imposed in this country who do not possess one or more of the personality disorders or one or more of the neuroses recognized as mental disorders by the American Psychiatric Association. To hold that each of these conditions must be a mitigating factor when the death penalty is considered would be to undermine the death penalty under the guise of acknowledging that what the American Psychiatric Association finds to be a mental disorder must be treated as a factor that calls for less severe punishment than death.

 *Id.*

5. In determining that Weeks's trial counsel was not ineffective "in any manner" for failing to locate records of Weeks's previous psychiatric commitment, the coram nobis court commented that "[t]his Court is well aware of the condition of records maintained by the former circuit clerk of Macon County." *Weeks*, 568 So.2d at 871.

lunacy. There obviously were none in my opinion. And, based upon the fact that—and I believe this—that we as lawyers are simply channels through which we litigate cases for clients. The clients are the owners of those cases. I felt that based upon his vehemence, the vehemency in the area, based upon what nonfindings I had found, I concluded that the only way to proceed was not to file such a motion.

Coram Nobis Hearing at 31–32. Moreover, Weeks's counsel testified that, if he had obtained Weeks's prior mental history, he would not have raised the sanity issue then or even if he had the opportunity to try the case again. *Id.* at 97. His opinion was based on his experience in trying criminal cases in Macon County and his belief that he had a "decent chance" of winning since the state's case was "circumstantial primarily." *Id.* at 97–98. Even if he had acquired the Bryce Hospital records, the trial counsel acknowledged that the final opinion of the clinical staff was that Weeks was competent to stand trial. *Id.* at 96.

When questioned at the coram nobis hearing concerning his reasons for not pursuing an insanity defense, Weeks's trial counsel explained:

> I did not pursue an insanity defense, because I didn't think it was applicable in this case. I think it's poor defense strategy unless you have a lunatic ... on your hands a defendant or someone who obviously has a clear mental disease or defect. I think Alabama juries have clearly evidenced through their verdicts that it's a scapegoat. The people of Alabama are not buying it. It's poor defense work. If you've got any shot at all, you clear your defendant as charged. You don't come in with not guilty by reason of insanity unless it applies. You're assuring the defendant's guilt that way. That's the reason.

*Id.* at 90. Accordingly, Weeks's trial counsel determined that innocence was the best theory of defense.[6] The coram nobis court further found that the two theories of defense, that Weeks did not kill Batts and that Weeks was insane at the time of the murder, were "mutually exclusive." *Weeks,* 568 So.2d at 870.

 Our analysis of Weeks's ineffective assistance of counsel claims is governed by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under the two-pronged *Strickland* test, Weeks must establish: (1) that his trial counsel's representation was deficient, and (2) that this deficient representation prejudiced Weeks's defense. *Id.* at 687, 104 S.Ct. at 2064. In evaluating the deficiency issue, the "proper standard" is "reasonably effective assistance," or "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 688, 690, 104 S.Ct. at 2064, 2066. The Court cautioned that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689, 104 S.Ct. at 2065. Importantly, Weeks "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)). The Court also recognized that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Id.* at 691, 104 S.Ct. at 2066.

 Under the prejudice prong of the *Strickland* test, Weeks must demonstrate "a

---

**6.** At the coram nobis hearing, Weeks's trial counsel testified that he "advised [Weeks] at every stage of the proceeding as to what tactics we would take, and he pretty much affirmed the same." Coram Nobis Hearing at 92. When the court specifically questioned the attorney as to Weeks's reaction to an insanity defense, the counsel stated that Weeks was "[v]ehemently against it,.... Strongly. Told me he wasn't going to allow me to raise it. And that he was not insane, that he was lucid." *Id.* Other than discussing a plea with him, Weeks testified that his attorney "asked me did I want to plead insane, and I told him no." *Id.* at 112. In response to the court's further questioning, Weeks reiterated that he did not tell his counsel that he wanted to plead not guilty by reason of insanity. *Id.* at 120.

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. Thus, Weeks must show that his counsel's allegedly deficient performance deprived him of a fair trial. *Id.* at 687, 104 S.Ct. at 2064. To succeed on each instance constituting his claim of ineffective assistance of counsel, Weeks must establish *both* the deficient representation and the prejudice prongs of the *Strickland* test. *Id.* "Our role in collaterally reviewing state judicial proceedings is not to point out counsel's errors, but only to determine whether counsel's performance in a given proceeding was so beneath prevailing professional norms that the attorney was not performing as 'counsel' guaranteed by the sixth amendment." *Bertolotti v. Dugger,* 883 F.2d 1503, 1510 (11th Cir.1989) (footnote omitted) (quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064), *cert. denied,* 497 U.S. 1032, 110 S.Ct. 3296, 111 L.Ed.2d 804 (1990).

In this case, the only reason that Weeks could fault his trial counsel for not investigating or acquiring knowledge of his prior mental history would be for counsel's failure to raise an insanity defense. Yet, Weeks vehemently opposed this defense when his trial counsel pursued it in consultation with him prior to trial, proclaimed his innocence, and told his attorney that he had no mental history. Indeed, the counsel's search of the county records did not reveal Weeks's previous commitment for psychiatric evaluation, tending to confirm Weeks's representation to his attorney. "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. In *Bertolotti,* we found it "dispositive" that the habeas petitioner had informed his trial counsel that he "had never experienced any previous mental problems," when he alleged that his attorney had failed to discover substantial evidence of his psychological problems. 883 F.2d at 1514; *cf. Agan,* 12 F.3d at 1018 (trial counsel "relied solely on [petitioner's] statements that he had no history of psychiatric problems," conducted no independent investigation, and made no personal assessment).

Additionally, the trial counsel's observations of and interactions with Weeks during approximately ten pretrial consultations are the bases for the attorney's testimony that Weeks "always appeared lucid, there were no visible signs of mental instability and [he] never thought [that Weeks] was irrational." *Weeks,* 568 So.2d at 869. The counsel "had no difficulty communicating with [Weeks] who was cooperative and discussed the procedures associated with the trial." [7] *Id.* Similarly, the trial counsel in *Bertolotti* "did not have any reason to think that Bertolotti was less than forthcoming; counsel testified that he interviewed Bertolotti numerous times, found Bertolotti communicative and appropriately behaved, and was 'very comfortable with Mr. Bertolotti.'" 883 F.2d at 1515; *cf. Bundy v. Dugger,* 816 F.2d 564, 566–67 n. 2 (11th Cir.) (per curiam) (competency inquiry "is limited to whether defense counsel suspected that his client was incompetent to stand trial"; "[i]f defense counsel suspects that the defendant is unable to consult with him ' "with a reasonable degree of rational understanding," ' he cannot blindly accept his client's demand that his competency not be challenged" (citation omitted)), *cert. denied,* 484 U.S. 870, 108 S.Ct. 198, 98 L.Ed.2d 149 (1987). Accordingly, nothing in Weeks's behavior or communication put his trial counsel on notice that he was dealing with less than a rational individual for whom the insanity defense was warranted. *See Ake v. Oklahoma,* 470 U.S. 68, 90, 105 S.Ct. 1087, 1100, 84 L.Ed.2d 53 (1985) (Rehnquist, J., dissenting) (even a spree of brutal murders is insufficient cause to question sanity "unless one were to adopt the dubious doc-

---

7. At the coram nobis hearing, Weeks's trial counsel testified that Weeks assisted in his own defense by telling him what the facts were and responding to questions. Coram Nobis Hearing at 94. From his discussions with Weeks, the counsel further testified that Weeks appeared to comprehend the nature of the charges against him, the possible penalties if convicted of a capital offense, and the guilt/innocence and sentencing phases of the trial. *Id.* The attorney also testified that, "[o]n three occasions," Weeks told him that he was "overly satisfied" with the attorney's handling of the case. *Id.*

trine that no one in his right mind would commit a murder").

Weeks's trial counsel also testified that he did not pursue an insanity defense because, in his judgment, "it would have been poor strategy."[8] *Weeks*, 568 So.2d at 869. This assessment was because "[t]he insanity defense assumes a criminal defendant was guilty, but was not responsible for his actions," and the counsel believed that "unless a criminal defendant was visibly crazy, juries were not likely to accept the insanity defense." *Id.* at 869–70. Based on the circumstantial evidence, other than the ballistics testimony, and "since [Weeks] was black and all the members of the jury were black, along with the tendency of juries in Macon County to return not guilty verdicts," Weeks's trial counsel testified that he considered Weeks's "best chance of acquittal was on a plea of not guilty." *Id.* at 870. Thus, after thoroughly considering the consequences of an insanity defense, Weeks's counsel strategically decided not to employ an insanity defense. *See Bertolotti*, 883 F.2d at 1515 (counsel's attempt to save petitioner's life by arguing for second-degree murder rather than first-degree murder and not opting for the unrealistic defense of not guilty by reason of insanity was "sound trial strategy"); *Williams v. Kemp*, 846 F.2d 1276, 1280–81 (11th Cir.1988) (trial attorney's decision not to call a defense expert to challenge prosecution witness's testimony concerning bloodstains on petitioner's boots matching that of the victim was "a deliberate tactical decision" in conjunction with the defense strategy that petitioner had tried to assist the victim after he was beaten by another), *cert. dismissed*, 489 U.S. 1094, 109 S.Ct. 1579, 103 L.Ed.2d 931 (1989), *and cert. denied*, 494 U.S. 1090, 110 S.Ct. 1836, 108 L.Ed.2d 965 (1990).

█ Weeks's trial counsel made a reasoned decision not to pursue an insanity defense not only because of his strategic determinations, but also because Weeks strongly opposed it, Weeks did not exhibit any outward indication of irrationality, and counsel's search of county records did not show any mental commitment for Weeks. Consequently, the trial counsel apparently did not investigate the matter further. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. Weeks also told the coram nobis judge that he thought that his trial attorney did the best that he could "under the circumstances." Coram Nobis Hearing at 120. Further, the reported case to which Weeks cites states that the Bryce Hospital records were not in the record of Weeks's former case and the insanity defense was rejected. *Weeks*, 342 So.2d at 1337. Based on the trial counsel's reasoning to which he testified at the coram nobis hearing, we agree with the district court's conclusion that counsel's failure to discover previous records of mental commitment in 1974 in connection with an unrelated crime was not deficient representation.

█ We further are convinced that Weeks cannot overcome the prejudice prong of the *Strickland* test. To surmount this requirement, Weeks would have to establish a reasonable probability that his trial counsel's failure to discover and review his mental history from Bryce Hospital and, thus, to present an insanity defense, would have resulted in his being found not guilty by reason of insanity. Even if these records had been available to Weeks's trial counsel and thoroughly reviewed by him, the last report by Bryce Hospital upon Weeks's discharge was that he was sane and fit to stand trial on the grand larceny charge. The final evaluation from Bryce Hospital would have undermined

---

8. Describing his consultation with Weeks as to his defense strategy and the determination to plead not guilty, his trial counsel testified at the coram nobis hearing that "[h]e and I together explored all possibilities and came to the conclusion that was our best opportunity." Coram Nobis Hearing at 100. Explaining why he want-

ed to plead not guilty and go to trial rather than not guilty by reason of insanity, Weeks told the coram nobis judge that "I felt that—that because I was innocent of it and he was my lawyer, you know, and I feel that—that I couldn't be convicted of it, you know." *Id.* at 120.

and negated an insanity defense rather than supported it.

Additionally, the assessment by Taylor Hardin Secure Medical Facility, which evaluated Weeks relative to his mental condition at the time of the alleged murder in *this* case and his ability to be tried for a capital offense, confirms our view. The conclusion of that facility was that Weeks was not mentally defective or experiencing any emotional disturbances. If Weeks was not suffering from a mental disease or defect at the time of the crime or at trial, then he was not prejudiced by his counsel's failure to present the mental history that he contends should have been submitted. *Cf. Agan,* 12 F.3d at 1018, 1019 (trial counsel was ineffective for having "only spent seven (7) hours conducting *any* sort of external investigation" of the capital case, never attempting to obtain *any* medical or military files, conducting "*no* independent inquiry" into petitioner's extensive psychiatric background, having "*no* idea" that petitioner "was taking several psychotropic medications at the time of the proceedings," *not* considering his " 'irrational and bizarre' behavior during the proceedings," and failing to realize "substantial facts suggesting [petitioner's] innocence" (emphasis added)).

Because of the tactical, strategic reasons given by Weeks's trial counsel for not pursuing an insanity defense, we see no rationale for his changing his defense of Weeks *even if he had discovered and reviewed the Bryce Hospital records.* Given the ultimate conclusion of Bryce Hospital that Weeks was sane upon discharge to stand trial in 1974, we cannot envision why those records would encourage an insanity defense or would have resulted in a jury's determination that he was insane at the time of the subject murder in 1981. Therefore, Weeks's trial counsel was not ineffective in not pursuing an insanity defense based on records of a previous mental commitment for another crime, when he had Weeks's instruction not to use the insanity defense, no indication from interacting with Weeks that insanity was a viable defense, no county record evidence of Weeks's prior mental commitment, a reasoned tactical decision that innocence was a better trial strategy than an insanity defense, and the final conclusion of those undiscovered records would not have supported an insanity defense that would have changed the result of the trial.

Apart from the guilt phase, Weeks also asserts that his trial counsel should have requested a mental examination after the guilty verdict prior to sentencing. Weeks bases this instance of ineffectiveness in ground two on his response after the jury returned the guilty verdict. He contends that his reaction should have brought his mental competency into question and caused his attorney to request a mental examination. At the sentencing hearing that occurred the day following his conviction, Weeks's counsel informed the court that, against his advice, Weeks was adamant that the jury not participate in the sentencing phase of his trial and that Weeks demanded that the court impose the death penalty. The court explained to Weeks that only two sentences were available to him and ascertained his desires concerning sentencing as represented by his attorney:

> THE COURT: Varn[a]ll, I understand that you have been found guilty of capital murder by a jury. You're entitled to have the jury participate in a sentencing process. There are only two sentences, death or life without parole. You have a right to have the jury participate in that sentencing hearing. But you may with the consent of the court and the state waive that right to have the jury participate and let me have the sentencing hearing. I have been told that that's what you want. But you have to tell me yourself that you want your sentencing hearing before me without a jury.
>
> VARN[A]LL WEEKS: Yes, sir, I want you to pass sentence on me. See, I want the death sentence. See, because they done gave me—they put the burden of this guy's life on me. And so I want the same thing that he got. I want the death penalty.
>
> THE COURT: You want to waive your right to have the jury participate in the hearing?
>
> VARN[A]LL WEEKS: Yes, sir, they had their chance to participate. I don't want to deal with them anymore.

THE COURT: I see. And you waive that right to have them participate in the sentencing hearing?

VARN[A]ELL WEEKS: Yes, sir.

Sentencing Hearing at 388–89. In response to the judge's question concerning whether Weeks knew what he was doing, he answered: "Yes, sir, I know exactly what I'm doing." *Id.* at 390.

Because Weeks's trial attorney had reservations about his client's still claiming his innocence while demanding execution and his waiving jury participation in his sentencing, he requested that the court allow him to question Weeks on the record concerning his advice to Weeks:

> MR. SMITH [Weeks's attorney]: I want to ask Varn[a]ll this. As your lawyer is it not true that I advised you that I thought that your chances would be better before a jury? I gave you that advi[c]e?
>
> MR. WEEKS: Yes, sir.
>
> MR. SMITH: You don't go along with that advi[c]e? You would rather still have it [sentencing] before the Judge; is that correct?
>
> MR. WEEKS: Well, the jury have had their chance to decide on that case, you know. They decided I was guilty. So if I'm guilty of the case then I should be given the death penalty for it.

*Id.* at 390–91.

At the coram nobis hearing, Weeks's trial counsel explained his interpretation of Weeks's waiver of jury participation in his sentencing and his request for execution as well as the meaning of his statement to the court at sentencing that he did not believe that Weeks was in his right mind that morning:

> My thoughts at the time [were] that he was very angry and very upset with the jury for rendering a verdict of guilt and was—at that point didn't want their participation in the matter [sentencing] at all. Felt they had already done him enough damage, as he said.... All the time I had spent with him previously didn't indicate to me incompetency. I didn't have any records to indicate incompetency. Anger would be a good word, with the jury.

. . . .

> I had some questions as to his emotional equilibrium. I was not—I don't think I can actually say I had questions of his competence, because I didn't dwell on that ... at that time. He had already been found guilty, and I think that I tended to at that point feel that his reaction was more of an emotional backlog of, I have been found guilty, than a question of his mental instability.

. . . .

> I think this from the Record when I said, "I don't think he's in his right mind," I meant this: In terms of his reasoning power to be so angry at a jury that convicted him that to lessen his chances of death, to fail to want to have that jury participate in the sentencing I think would be a person not within their right mind in the context of their own best welfare at that point. I don't know that I so much would refer to it as mental competent—incompetency as I refer to as just down right anger, hostility, and vengeance.... The only evidence that I had at that point was of his anger, and I thought he was literally out of his mind figuratively in terms of his strategy in not having that jury participate. But I didn't mean, Jock Smith, I say that he's incompetent.

Coram Nobis Hearing at 63, 64, 68, 69–70.

Therefore, Weeks's trial attorney viewed his waiver of jury participation in his sentencing as "not ... an indication of mental imbalance," but "an indication and a very emotional reaction to being found guilty." *Id.* at 72. Weeks contends, however, that his response to the guilty verdict should have provided his counsel with sufficient cause to request a mental examination. Thus, he asserts that his counsel was ineffective at the sentencing phase for not requesting such an examination when Weeks waived jury participation in his sentencing following his conviction. After hearing the evidence on whether there should have been a competency evaluation of Weeks between the guilt and sentencing phases of trial, the coram nobis judge

ruled that "the Record is clear that [the trial attorney] did everything that a lawyer could do under the circumstances." [9] *Id.* at 80–81.

The *Strickland* analysis also applies to claims of ineffectiveness at the penalty stage of a capital case. 466 U.S. at 686–87, 104 S.Ct. at 2064; *Doyle v. Dugger*, 922 F.2d 646, 650 (11th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 342, 116 L.Ed.2d 282 (1991). In *Ake*, the Supreme Court concluded that, following a defendant's preliminary showing that his sanity is in question, the Constitution requires the state to provide access to a psychiatrist if the defendant cannot afford one.[10] 470 U.S. at 74, 105 S.Ct. at 1091–92. The burden of proof to demonstrate insanity is on the defendant. *Cowley v. Stricklin*, 929 F.2d 640, 644 (11th Cir. 1991); *see United States v. Cronic*, 466 U.S. 648, 658, 104 S.Ct. 2039, 2046, 80 L.Ed.2d 657 (1984) ("[B]ecause we presume that the lawyer is competent to provide the guiding hand that the defendant needs, the burden rests on the accused to demonstrate a constitutional violation." (citation omitted)).

*Ake*, however, involved a defendant whose bizarre behavior in open court caused the trial judge *sua sponte* to order that he be evaluated by a psychiatrist. 470 U.S. at 71, 105 S.Ct. at 1090. We have held that *Ake* is implicated "when the defendant exhibits compelling evidence of incompetency or insanity," but that *Ake* "does not require that counsel faced with significantly less compelling evidence of mental instability" should progress from a preliminary inquiry to examination by a mental health expert. *Bertolotti*, 883 F.2d at 1511; *see Messer v. Kemp*, 831 F.2d 946, 964–65 (11th Cir.1987) (en banc) (trial judge's denial of indigent defendant's motions for independent psychiatric examination did not deprive defendant of due process or a fundamentally fair trial at either the guilt or sentencing stages of the murder prosecution), *cert. denied,* 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 902 (1988). "As the

state would not be required by the federal constitution to fund an examination under such circumstances, counsel cannot be *per se* deficient for not requesting an examination." *Bertolotti*, 883 F.2d at 1511 (citation omitted). We assess the facts "as of the time of counsel's conduct," realizing that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066.

In *Bertolotti*, the petitioner argued that his counsel was ineffective for failing to have him psychiatrically examined because a tape of his confession showed extreme emotional distress, he stated that he did not know what was happening, he gave an inherently unbelievable explanation for the murder, his girlfriend stated that he needed psychiatric help, and the murder was particularly brutal. We concluded that each of these circumstances plausibly could be explained other than by mental illness, and, thus, counsel was not ineffective in failing to request a mental examination. *Bertolotti*, 883 F.2d at 1512–15. At the sentencing phase of Bertolotti's trial, his counsel attempted to have him interviewed by a psychiatrist, but Bertolotti refused. We determined that counsel did not behave "unreasonably by not taking further steps to encourage Bertolotti to undergo an examination." *Id.* at 1516.

Additionally, "a defendant must demonstrate something more than a mere possibility of assistance from a requested expert." *Moore v. Kemp*, 809 F.2d 702, 712 (11th Cir.) (en banc), *cert. denied,* 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987). He must show "a reasonable probability" that the expert would be of assistance and that denial of such assistance would result in fundamental unfairness. *Id.* We specifically have held that a defendant must demonstrate a *substantial basis* in order to justify asking the court to appoint an expert for psychiatric evaluation. *Messer*, 831 F.2d at 960.

9. This ruling was preceded by a discussion with counsel confirming that a mental examination is not granted on demand, but after evidence is presented to the court demonstrating that there is a basis for having a person institutionalized for evaluation. Coram Nobis Hearing at 80.

10. *Ake* applies to this case because it was decided on February 26, 1985, before Weeks's direct appeal from his conviction became final on April 15, 1985.

■ The reaction of Weeks to his conviction in waiving participation of the jury in his sentencing was interpreted by his trial counsel as signifying anger or other emotions resulting from the verdict, and not mental illness. This was not an unreasonable conclusion since the attorney had seen no evidence of incompetence throughout his representation of Weeks, who had vehemently opposed an insanity defense. Based on testimony from another capital habeas petitioner's counsel that he "had no problems communicating" with petitioner, who "gave no indication that he was ever out of touch with reality" and made "his own decisions," we held that the attorney's decisions "not to investigate [petitioner's] psychological history more thoroughly, not to have [petitioner] examined by a psychiatrist or psychologist, and not to present mitigating psychological evidence at the sentencing hearing" were "within the wide range of reasonable professional judgment." *Bush v. Singletary,* 988 F.2d 1082, 1092 (11th Cir.1993) (per curiam), *cert. denied,* —— U.S. ——, 114 S.Ct. 705, 126 L.Ed.2d 704 (1994); *see Stephens v. Kemp,* 846 F.2d 642, 653 (11th Cir.) (no further duty of inquiry for the guilt phase when preliminary investigation of psychiatric evidence reveals that petitioner was hospitalized for psychiatric problem between four and six months prior to crime, but psychiatric report indicates no evidence of severe mental illness), *cert. denied,* 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988).

Weeks's response certainly was not the dramatic, compelling behavior that we have required for *Ake* to apply. While jurists and attorneys may recognize the potential detrimental consequences in not having the jury participate in the sentencing phase, we are not persuaded that a layperson, who had just been convicted by a jury for murder, would necessarily demonstrate insanity by not wanting the same jury to participate in his sentencing, which involved the death penalty. Further, this reaction did not provide a basis for his attorney to represent to the court that a reasonable probability existed that the sentencing would be fundamentally unfair without a prior psychiatric examination of Weeks to justify requesting appointment of such an expert. We conclude that the district court correctly determined that trial counsel's not requesting a mental evaluation of Weeks before his sentencing was not deficient.

■ We also do not find prejudice in trial counsel's not requesting a mental examination before sentencing because we are not convinced that the sentence would have been different. "On the prejudice issue, the petitioner must show that, but for counsel's unprofessional errors, there is a reasonable probability that the sentencer would have weighed the balance of aggravating and mitigating factors to find that the circumstances did not warrant the death penalty." *Bush,* 988 F.2d at 1090. There were only two sentences available: life without parole or death.

Because of the overwhelming evidence of Weeks's guilt in the brutal murder of the Tuskegee veterinary student for his car, we conclude that the sentencing judge would have given the death penalty with or without jury participation, which is merely a sentencing recommendation. Trial counsel's requesting a mental examination of Weeks at this stage of the trial would not have assisted Weeks in the guilt phase. Consequently, Weeks could not have been prejudiced by his attorney's not requesting a mental evaluation before sentencing. Weeks's "own statements and actions contradict much of the [psychological] evidence he contends should have been introduced in mitigation" at sentencing. *Id.* at 1093. Because we do not find that trial counsel's not requesting a mental examination was constitutionally deficient or prejudicial to Weeks, this instance of ineffective assistance is without merit.

### 2. Procedural Bar

The district court determined that grounds three through ten and ground nineteen, alleging specific instances of ineffective assistance of counsel, were procedurally barred because Weeks did not raise them in the state error coram nobis proceeding.[11] In-

---

**11.** Grounds three through ten and nineteen, raised in district court, are as follows:

(3) Trial counsel was ineffective in making an opening statement that he knew could not be

deed, Weeks's habeas counsel concedes that "[w]e do not suggest that each and every instance of attorney Smith's inadequacy was specifically raised at the coram nobis hearing." Appellant's Brief at 24. "Generally, all habeas corpus claims seeking to overturn a state conviction in federal court must have been previously raised and exhausted in the state court." *Atkins v. Attorney General,* 932 F.2d 1430, 1431 (11th Cir.1991) (citing *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982)); *see Footman v. Singletary,* 978 F.2d 1207, 1211 (11th Cir.1992) ("[A] habeas petitioner may not present instances of ineffective assistance of counsel in his federal petition that the state court has not evaluated previously.").

■■■■ Thus, a federal habeas court *first* must determine whether an issue was properly preserved for habeas corpus consideration *before* it can determine whether an evidentiary hearing is warranted and apply the *Strickland* standard for ineffective assistance of counsel. A habeas petitioner is not entitled to an evidentiary hearing to develop facts that he failed to show in state court unless he can establish cause for and prejudice from such failure. *Keeney v. Tamayo-Reyes,* — U.S. —, —, 112 S.Ct. 1715, 1719–20, 118 L.Ed.2d 318 (1992); *see Mathis v. Zant,* 975 F.2d 1493, 1497 (11th Cir.1992) (although the district court allowed petitioner to submit additional evidence supporting his

claim of ineffective assistance at the sentencing stage and granted relief largely based on this evidence, we reversed and held that *Keeney* required petitioner to show cause and prejudice before reviewing evidence that was not presented in state court). Without a cause and prejudice showing for evidence not submitted to the state court, a habeas petitioner is procedurally barred on federal habeas review just as he is from presenting new claims not previously before the state court.

Further, Alabama has codified a "new claim" or "different grounds" successive petition bar:

> A second or successive petition on different grounds shall be denied unless the petitioner shows both that good cause exists why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and that failure to entertain the petition will result in a miscarriage of justice.

Ala.R.Crim.P.Temp. 20.2(b).[12] We have held that this successive petition bar must be applied by federal habeas courts in Alabama capital cases. *See, e.g., Richardson v. Johnson,* 864 F.2d 1536, 1540–42 (11th Cir.) (per curiam), *cert. denied,* 490 U.S. 1114, 109 S.Ct. 3175, 104 L.Ed.2d 1037 (1989); *Lindsey v. Smith,* 820 F.2d 1137, 1143 (11th Cir.1987),

---

substantiated because he already knew that [Weeks] would not testify on his own behalf.
(4) Trial counsel was ineffective in not conceding the chain of custody of certain evidence, thereby allowing the prosecution to introduce prejudicial evidence of a prior crime.
(5) Trial counsel was ineffective in not obtaining a copy of the prior testimony of certain witnesses, and, therefore, failed to properly cross-examine these witnesses.
(6) Trial counsel was ineffective by not objecting to the introduction into evidence of gruesome photographs of the body of the murder victim.
(7) Trial counsel was ineffective in not objecting to the prosecutor's closing argument, in which the prosecutor referred to [Weeks] as a "mad dog" and an "animal."
(8) Trial counsel was ineffective in failing to move for a change of venue in light of prejudicial news coverage of the murder in Macon County.
(9) Trial counsel was ineffective in failing to present mitigating evidence at [Weeks's] sen-

tencing hearing, although such evidence existed.
(10) [Weeks's] appellate counsel was ineffective by failing to present the issues noted in [grounds] (1) through (9) on appeal.

. . . .

(19) Trial counsel was ineffective by failing to confront and cross-examine a State's witness who was also trial counsel's client.
R1–19–4–6, 8 (citations omitted).

**12.** Alabama Rule of Criminal Procedure 20.2(b) was codified as a temporary rule, effective April 1, 1987. *Toles v. Jones,* 888 F.2d 95, 98 (11th Cir.1989) (per curiam), *vacated,* 905 F.2d 346 (11th Cir.1990), *reinstated,* 951 F.2d 1200 (11th Cir.) (en banc), *cert. denied,* — U.S. —, 113 S.Ct. 106, 121 L.Ed.2d 65 (1992). Although the present Alabama Rule of Criminal Procedure 32.-2(b) replaced Rule 20.2(b) effective January 1, 1991, the language is identical. Thus, Rule 20.-2(b) was in effect at the time of Weeks's error coram nobis hearing in April, 1988.

*cert. denied,* 489 U.S. 1059, 109 S.Ct. 1327, 103 L.Ed.2d 595 (1989).

Weeks appears to argue that the general claim of ineffective assistance in state court preserves for federal review all alleged instances of ineffectiveness, regardless of whether evidence of a particular act was presented to the state court. We have held that presentation of *some* ineffective instances in state court does not preserve in federal court *other or all* instances of ineffective assistance that were not presented in state court claims, when such a procedural bar exists. *See Aldridge v. Dugger,* 925 F.2d 1320, 1326 (11th Cir.1991). "[A]llowing a habeas petitioner to allege a single instance of ineffective assistance in his state postconviction proceedings and then proceed to federal court to allege additional instances would be contrary to the state's 'full and fair opportunity to address the claim on the merits.'" *Footman,* 978 F.2d at 1211.

Weeks also seems to contend that he presented these instances of ineffective assistance through testimony at the state coram nobis hearing. The district court, however, found that "[n]one of the ineffective assistance claims asserted in Grounds (4) through (7) were raised by [Weeks] at his error coram nobis proceeding, either through his petition or by evidence presented at the State Court hearing." R1–19–27. The district court also found that ground ten "has never been presented to any Alabama State Court in any fashion, and is, therefore, procedurally barred from federal habeas review." *Id.* at 33. Our review of the record validates these factual findings by the district court and thus satisfies our clearly erroneous review standard.

Although the district court recognized that there was some discussion relating to the instances of ineffective assistance in grounds three, eight, and nine at the error coram nobis hearing, it found factually that none of those grounds was properly preserved because they had not been alleged in the error coram nobis petition. *See Lindsey,* 820 F.2d at 1143 ("One of the federal habeas claims asserted by appellant was not raised in the state coram nobis proceedings, and thus properly was found by the district court to be procedurally barred."). Our review of the record verifies these factual findings.[13] The

---

**13.** Ground three relates to statements made by Weeks's counsel in his opening statement that Weeks would show that he needed an automobile to go to Detroit, Michigan to obtain drugs, that he rented the automobile and driver's license from Batts, and that Batts was still alive when Weeks left Tuskegee, Alabama. Weeks's trial counsel, however, knew that Weeks would not testify and he presented no testimony for the defense. At the coram nobis hearing, Weeks's coram nobis counsel asked his trial counsel if these comments made in his opening statement had not placed Weeks in a precarious position, when he did not intend to present a defense. The state objected because "[i]t's not grounded in any of the claims stated in the petition." Coram Nobis Hearing at 53. The judge then asked Weeks's coram nobis counsel specifically if this issue had been raised, and he responded, "No." *Id.* at 54.

In ground eight, Weeks alleges that his trial counsel should have moved for a change of venue because of prejudicial news coverage of the murder in Macon County. While this ground was not raised in Weeks's error coram nobis petition, the judge did accept evidence concerning this issue. At the coram nobis hearing, Weeks's trial counsel stated:

In terms of getting a fair trial in Macon County, ... though I raised for the Record the issue of venue, [Weeks's] best shot was here in Ma-

con County. Macon County has a history of bending over backwards for defendants. It's a jurisdiction—it's good to practice in if you're a defense lawyer.

. . . .

[T]here have been cases I've had in Macon County where I've gone in feeling that we had a tough row to hoe and come out with an acquittal, and I've always wondered whether that was because I was a good lawyer or because of the system here.

*Id.* at 49, 50. Rather than raising this issue and preserving it for habeas review, Weeks's trial counsel explained that he made a strategic decision not to move the trial from Macon County because, based on experience, he thought that Weeks had the best chance for acquittal there. Further, this is the type of tactical decision that the Supreme Court has recognized that a criminal defendant's counsel may elect as a reasonable choice considering all of the circumstances and has cautioned courts against questioning. *Strickland,* 466 U.S. at 688–89, 104 S.Ct. at 2065.

Weeks alleges in ground nine that his counsel was ineffective for failing to present mitigating evidence of his mental history at the sentencing hearing. Although the state court heard evidence on this issue, Weeks's error coram nobis petition does not include this issue of ineffectiveness at sentencing. Moreover, the record of the

Supreme Court has found it "irrational to distinguish between failing to properly assert a federal claim in state court and failing in state court to properly develop such a claim." *Keeney,* —— U.S. at ——, 112 S.Ct. at 1719. Further, "[e]xhaustion means more than notice. In requiring exhaustion of a federal claim in state court, Congress surely meant that exhaustion be *serious and meaningful."* *Id.* at ——, 112 S.Ct. at 1720 (emphasis added). Additionally, "the mere existence of a 'plain error' rule does not preclude a finding of procedural default; moreover, the assertion by an Alabama court that it did not find any errors upon its independent review of the record does not constitute a ruling on the merits of claims not raised in that court

coram nobis hearing verifies that this claim is unavailable for federal habeas review.

Following questioning of Weeks's trial counsel concerning the circumstances of Weeks's sentencing by his coram nobis counsel, the state prosecutor objected because "[t]here is not a claim in here of ineffective assistance of counsel for failing to present any possible mitigation." Coram Nobis Hearing at 71. The court responded: "I agree." *Id.* Nevertheless, Weeks's coram nobis counsel continued to question the trial counsel about aspects of Weeks's sentencing with the court interrupting throughout to note that the subjects of his questioning appeared to be procedurally barred. *See, e.g., id.* at 73 ("Is that a matter that's raised in this [coram nobis] petition?"). When the questioning persisted, the judge made clear his position on issues at sentencing relating to Weeks's mental condition:

Okay. Now, Counsel, I'm not going to let you do—I realize that you're doing a little bit of what they call g[ ]ilding the li[ ]ly, I think. *You're asking questions about things that don't have a thing to do with the Court—apparently with an eye towards appealing the thing. But what you're asking doesn't really have anything to do with the issue before the Court, and you're trying to make counsel here look bad about issues that haven't been raised. And I want to make that clear in the Record.* A good bit of what you've been allowed to go into has gone far afield from the question of competency or incompetency vel non the question of his not raising insanity as a defense. You've got a duty to represent your client as zealously as he did. And that's not what you're doing right now. *You're trying to just make him look bad and on matters that are unrelated to the matters raised in your Coram Nobis.* You have no duty to do that.

*Id.* at 83–84 (emphasis added).

Following this admonishment by the court, Weeks's counsel moved to another issue that he "believe[d] was raised." *Id.* at 84. At the outset of the coram nobis hearing, Weeks's coram nobis counsel agreed with the court that the only issue that was not procedurally barred was trial counsel's failure to raise an insanity defense. *Id.* at 20. Nevertheless, Weeks's coram nobis counsel attempted to raise additional issues in the course of the hearing. At this subsequent point in the hearing and at the court's prompting, Weeks's counsel again acquiesced in the court's determination that the issue of ineffective assistance at sentencing for failing to raise Weeks's mental history was procedurally barred. *Id.* at 84.

Weeks's present counsel now claims that trial counsel should have used Chenoy Weeks's statement that Varnall had engaged in drinking and smoking marijuana throughout the night before the murder to show diminished capacity as mitigating evidence. The statement, however, because it would have been prejudicial to Weeks, describes how Varnall Weeks brutally murdered Mark Batts. Further, the statement does not support petitioner's contention that he "stay[ed] awake the night before the crime smoking marijuana, drinking beer and gin, and taking pills," Petitioner's Brief at 14, because Chenoy Weeks states that he "went to bed around 1:00 A.M. or 2:00 A.M., 1 October, '81," Trial Transcript at 402. *Since Chenoy Weeks went to bed, he could* not have known what Varnall did after Chenoy went to sleep. The reference to Varnall Weeks's taking pills occurred the morning of his abduction of Mark Batts and is unspecific as to whether he ingested a controlled substance or a nonprescription medicine, such as aspirin. At the coram nobis hearing, Varnall Weeks testified that he was not taking controlled-substance pills. Coram Nobis Hearing at 131. Petitioner's reference to his consumption of pills at this juncture is inconsistent and misleading.

Moreover, Chenoy Weeks had a documented history of institutionalization for mental illness. Varnall Weeks testified in his behalf at the sentencing hearing and told the judge that Chenoy Weeks's statement was not entirely accurate, to which the judge responded that he would not consider Chenoy Weeks's testimony in the case. Sentencing Hearing at 414. At the coram nobis hearing, Varnall Weeks testified that Chenoy was a "crazy man," who would not have known about Varnall's ingestion of "pills" because Chenoy himself was taking pills, apparently of the controlled-substance nature. Coram Nobis Hearing at 132. Chenoy Weeks was hospitalized at a mental facility at the time of trial. Even if petitioner's contentions as to mitigating evidence from Chenoy Weeks's statement were not procedurally barred, they would have been discredited by the prosecution on the basis of Chenoy Weeks's mental incompetence.

Finally, no family members testified at trial because they were either deceased or incarcerated. Weeks has not pleaded, presented or suggested any type of mitigation evidence that family members may have given. Significantly, Weeks has not shown that *he* suffered from any mental disease or defect at the time of the crime or at his trial.

or in any court below." *Julius v. Johnson,* 840 F.2d 1533, 1546 (11th Cir.) (per curiam), *modified on other grounds,* 854 F.2d 400 (11th Cir.), *cert. denied,* 488 U.S. 960, 109 S.Ct. 404, 102 L.Ed.2d 392 (1988).

■■■■ "When a defendant is barred from raising a federal constitutional claim in the state courts because of his failure to follow the state's procedural rules, he is also barred from raising the claim in his federal habeas petition absent a showing of cause for, and actual prejudice from, the procedural default." *Pitts v. Cook,* 923 F.2d 1568, 1571 (11th Cir.1991) (citing *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)). Because Weeks did not raise these new instances of ineffective assistance of counsel in his state collateral proceeding, he is barred from raising them in a federal habeas proceeding without a showing of cause and prejudice.[14] Rather than pursuing this potential method for overcoming the procedural bar, Weeks instead has relied only on his assertion that these issues were properly raised in state court. The Supreme Court has clarified that attorney error or ineffective assistance of counsel in a state collateral proceeding is not cause to override a procedural bar that precludes review of a claim in federal court. *Coleman v. Thompson,* 501 U.S. 722, ——,

111 S.Ct. 2546, 2566–68, 115 L.Ed.2d 640 (1991).

Since Weeks has not shown cause to excuse his state collateral procedural default of these newly asserted instances of ineffective assistance, there is no need for us to consider actual prejudice, the second required showing for the exception to apply. *See Engle,* 456 U.S. at 134 n. 43, 102 S.Ct. at 1575. "We do not examine the prejudice, if any, that resulted from the failure to raise these issues because the *Sykes* standard for relief from its rule is in the conjunctive. Having failed to show 'cause,' appellant necessarily fails the conjunctive." *Palmes v. Wainwright,* 725 F.2d 1511, 1526 (11th Cir.), *cert. denied,* 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984).

## B. *State's Failure to Disclose Exculpatory Evidence*

■■■ In Weeks's amended petition before the federal district court, he asserted an unusual corollary to his trial attorney's failure to investigate Weeks's prior mental history.[15] Weeks claims that the State was aware of this evidence and had a duty to disclose it under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Because Bryce Hospital is a state hospital, Weeks contends that this information should be imputed constructively to the prosecution.

**14.** In ground nineteen, Weeks claimed that his trial counsel was rendered ineffective because of a conflict of interest. The only evidence of a potential conflict of interest is trial counsel's closing argument wherein he discussed the testimony of the witness who saw Weeks on the street outside of Batts's house before the murder. The trial counsel commented that the witness was "a client of mine." Trial Transcript at 349. There is no indication whether the counsel represented the witness in a prior, unrelated civil matter or a current, related matter. *Compare Smith v. White,* 815 F.2d 1401, 1405 (11th Cir.) (no actual conflict where attorney represented witness in a prior, unrelated civil matter), *cert. denied,* 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987) *with McConico v. Alabama,* 919 F.2d 1543, 1548 (11th Cir.1990) (actual conflict where successful representation of one client could harm the claim of another client).

If this issue had been properly preserved for review, Weeks first would have to establish actual conflict of interest. That is, he "must show 'inconsistent interests and must demonstrate that

the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other.'" *McConico,* 919 F.2d at 1546 (quoting *Smith,* 815 F.2d at 1404). Additionally, the strict prejudice requirement of *Strickland* is relaxed in conflict of interest situations, and Weeks would need to show that the conflict had an "adverse effect" on counsel's representation. *McConico,* 919 F.2d at 1548 (citing *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068). The conflict of interest issue, however, has never been raised in any state court proceeding, and Weeks has not attempted to establish cause and prejudice for his failure to assert it. Accordingly, this issue is procedurally barred from federal habeas review.

**15.** The district court postulates that Weeks apparently has attempted an alternative method of implicating his previous mental history. In the event that trial counsel was not ineffective in failing to discover it, "then the State somehow suppressed this information." R1–19–42–43.

He further argues that, since his previous case occurred in Macon County, the same county as his capital case, the State had constructive knowledge of the psychiatric evidence.

Because Weeks did not raise a *Brady* claim at any time in his state court proceedings, the district court correctly ruled that this claim was procedurally barred. Even if we could recognize this claim, Weeks would have to "demonstrate (1) that the prosecution suppressed evidence (2) that was favorable to him or exculpatory and (3) that the evidence was material" to establish a *Brady* violation. *Delap v. Dugger,* 890 F.2d 285, 298 (11th Cir.1989), *cert. denied,* 496 U.S. 929, 110 S.Ct. 2628, 110 L.Ed.2d 648 (1990). Weeks has failed to meet any of these requirements, and he bears the burden of proof by a preponderance of the evidence. *Id.* at 311. Further, we are unimpressed by Weeks's attempt to fault the State for failing to be forthcoming with information that it may or may not have had, when clearly *he* was aware of his mental history and, presumably, would have advised his attorney.[16]

### C. *Expert Assistance*

In this court, Weeks raises a separate claim that he "has *never* received the assistance of a psychiatrist to help him flesh out the substantial evidence of his mental impairment and organic brain damage." Petitioner's Brief at 51 (emphasis added). He argues that such an expert should have assisted him in both the guilt and sentencing phases of his trial pursuant to *Ake.* Weeks did not raise a specific *Ake* claim in state court or in his federal habeas petition.

To the extent that this claim was implicated in our previous discussion of *Ake* relative to the guilt and sentencing phases, we incorporate that analysis wherein we found the requirements for *Ake* unsatisfied.[17] Inasmuch as Weeks attempts to present an auxiliary claim and to request a new trial and

sentencing, if convicted, we find the claim procedurally barred and reference our discussion of procedural default. Additionally, we note that Weeks has been hospitalized twice for extensive psychiatric examinations, at Bryce Hospital in his previous grand larceny case and at Taylor Hardin in connection with this case. After thorough psychiatric evaluations by numerous psychiatrists, Weeks was discharged from both institutions upon a conclusion of sanity. In addition to the procedural bar, we see no logic or probable change in diagnosis in further psychiatric examinations.

### III. CONCLUSION

In appealing the denial of his habeas petition in district court, Weeks has argued various instances of ineffective assistance of counsel, failure to present exculpatory evidence, and lack of expert assistance. The district court denied all of these claims on the bases of merits review or procedural bar. As we have analyzed herein, we AFFIRM.

---

**16.** We additionally note that the State likely would have been no more successful in locating Weeks's prior mental history in the county records than was his attorney, given the disorganized maintenance of the county records acknowledged by the coram nobis judge. Further, the record of Weeks's prior grand larceny conviction did not contain the mental evaluation

records from Bryce Hospital, as stated in that reported case. *Weeks,* 342 So.2d at 1337.

**17.** Essentially, it appears that Weeks merely is attempting to revisit potential grounds for an insanity defense in the guilt phase and a psychiatric evaluation in the sentencing phase.