**James AGAN, Petitioner–Appellee,**

**v.**

**Harry K. SINGLETARY, Jr., Robert A. Butterworth, Respondents–Appellants.**

No. 92–2442.

United States Court of Appeals,
Eleventh Circuit.

Jan. 11, 1994.

Mark C. Menser, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, FL, for respondents-appellants.

Larry Helm Spalding, Martin McClain, Gail E. Anderson, Office of the Capital Collateral Representative, Tallahassee, FL, for petitioner-appellee.

Before FAY, ANDERSON and EDMONDSON, Circuit Judges.

ORDER:

The court, *sua sponte*, issues the revised opinion attached.

FAY, Circuit Judge:

The State of Florida appeals the grant of James Agan's petition for writ of habeas corpus. We hold that the District Court for the Middle District of Florida properly issued the writ. Accordingly, we AFFIRM.

## I. PROCEDURAL HISTORY

On September 19, 1980, James Agan ("Agan") plead guilty to the murder of a fellow inmate, Dana DeWitt ("DeWitt"), at the Florida State Prison. As a result of the plea and sentencing proceeding, the court imposed a sentence of death.[1] *Agan v. State,* 445 So.2d 326 (Fla.1983), *cert. denied,* 469 U.S. 873, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984). After exhausting state remedies,[2] Agan filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the District Court for the Middle District of Florida. The court denied the petition. *Agan v. Dugger,* No. 87–489–Civ–J–16 (June 24, 1987).

Agan appealed the denial to our Court[3] and we remanded the case to the District Court with instructions to conduct an evidentiary hearing to determine the validity of Agan's ineffective assistance of counsel and competency claims. *Agan v. Dugger,* 835 F.2d 1337 (11th Cir.1987), *cert. denied,* 487 U.S. 1205, 108 S.Ct. 2846, 101 L.Ed.2d 884 (1988). Following the evidentiary hearing, the District Court granted the petition and issued the writ based on ineffective assistance of counsel and competency grounds. *Agan v. Dugger,* No. 87–489–Civ–J–16 (March 17, 1992). The State of Florida now appeals that determination. We have jurisdiction pursuant to 28 U.S.C. § 2253.

## II. FACTS

Agan was serving a life sentence for first degree murder without eligibility for parole for twenty-five years. During his incarceration at the Florida State Prison, Agan had a conflict with DeWitt over money DeWitt had allegedly stolen from him. Subsequently, Agan was disciplined by confinement in special restriction for two years for possession of a weapon which he purportedly intended to use against DeWitt.

### The Murder

Following the two year disciplinary confinement, Agan was returned to general pop-

---

1. The specific facts surrounding the plea and the sentencing will be addressed *infra* at section II.

2. After the Governor signed the first death warrant, Agan sought and obtained a stay of execution to initiate collateral review. *See In re Agan,* 466 So.2d 217 (Fla.1985); *State v. Green,* 466 So.2d 218 (Fla.1985). Agan then petitioned for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850 and the court denied the petition. *Agan v. State,* 503 So.2d 1254 (Fla.

1987). Following the issuance of a second death warrant, Agan petitioned for a writ of habeas corpus to the Florida Supreme Court. The petition was denied. *Agan v. Duggar,* 508 So.2d 11 (Fla.1987).

3. Agan also moved for a certificate of probable cause and a stay of execution. This Court granted the motions. *Agan v. Dugger,* 828 F.2d 1496 (11th Cir.1987).

ulation and assigned a job in a prison factory. Shortly thereafter, DeWitt was stabbed to death in his cell. Agan almost immediately accepted responsibility for the murder, but refused to offer many details regarding how the crime occurred. Specifically, after the prison officials placed him under arrest, Agan openly admitted guilt but vehemently refused to explain any of the incidents surrounding the murder or to specifically identify the murder weapon. During the recorded arrest proceedings taken on September 19, the day of the murder, Agan would not respond to certain questions:

Q. (By Colonel Barton): When you went to the cell today, was he laying down on the floor or standing up?

A. (Mr. Agan): I'm not going to answer that question: I don't know, sir, I just stepped out the door.

Q. Describe the knife to me.

A. I'm not going to do that ...

.    .    .    .    .

Q. (By Mr. Clark): You've got me confused a little bit Mr. Agan. If you don't want to answer any questions, that's okay. You know you can stop don't you?

A. Yes, sir.

Q. I don't understand why you won't describe the knife because you know that will be the evidence against you when you admit killing a man and that's evidence against you.

A. Well, see—

Q. I'm not trying to trick you, but that makes me wonder if you really killed the man.

.    .    .    .    .

Q. Well, I don't know. What I don't understand is that I'm not asking you to describe the knife. I'm not asking you that question. I'm asking you [sic] can you tell me why you admitted killing the man and you know the tape recorder is going and there are four other people in the room here to witness that, and you won't tell what the knife looked like.

A. I'm not going to tell you.

Q. Well, I understand that you won't do it. I understand that. I don't understand why.

A. Well, I—I didn't even want to talk about it.

Plaintiff's Exhibit 6—4—3–5.

However, on September 23, 1980—some *four days after* DeWitt's murder—Agan requested that Officer Ball take his statement regarding the incidents surrounding the murder. Agan stated to prison officials that, using factory machinery, he made a knife out of a piece of metal. He further stated that he selected a time when both he and DeWitt were in their cells and no prisoners or guards were around DeWitt's cell. He purportedly went to DeWitt's cell and fatally stabbed him in the neck. *See* Plaintiff's Exhibit 6—8. The four day gap between Agan's acceptance of responsibility for the murder and his detailed explanation of the circumstances surrounding the crime adds yet another question to an otherwise curious pattern of events.

### The Attorneys

John Stinson initially represented Agan. Stinson was appointed in the first week of October, 1980. Agan told Stinson that he wanted to confess and plea guilty. Stinson contacted investigator Leonard Ball who participated in the investigation of the DeWitt homicide. Ball told Stinson that there were several inmates under investigation and added that Agan might have been covering up for the actual murderers. Ball did not think that the case would go forward against Agan even though he was arrested following his confession. Stinson took notes on the conversation with Ball and later dictated them into a memorandum. On October 21, 1980, Stinson filed a motion to withdraw from representing Agan.

Following Stinson's withdrawal, the court appointed Mack Futch to represent Agan. Futch had little, if any, communication with Stinson regarding the case. In fact, Futch neither requested nor received a copy of Stinson's file.[4] Apparently as a result of

---

4. Stinson's file contained his memorandum of his conversation with Ball regarding the possibility of Agan's innocence.

Futch's confidence concerning Agan's guilt, Futch spent a total of approximately fifteen (15) hours on the case only seven (7) of which involved any actual investigation.

Furthermore, Futch did not interview any of the inmates, never obtained Agan's prison medical file which would have revealed a lengthy history of mental health problems, and had no idea that Agan was taking psychotropic medication at the time of the plea and sentencing. Futch ended the inquiry into Agan's family history when Agan was unwilling to answer questions. Likewise, Futch ended the inquiry into Agan's psychiatric background when Agan stated that he had no such history and refused to submit to a psychiatric examination.

### Agan's Mental Condition

At the evidentiary hearing before the District Court, Stinson testified that he was unsure whether Agan communicated in a completely rational manner. Although Agan did not appear "obviously medicated" or "heavily sedated," Stinson was concerned about Agan's competence. This concern was present even though Stinson did not know that Agan was taking medication during the time Stinson represented him. If Stinson had remained Agan's lawyer, he would have conducted a thorough investigation of Agan's mental background.

A brief review of Agan's mental health records by either Stinson or Futch would have, at the very least, revealed that: (1) Agan's military records reflect various blackout incidents; (2) Agan was diagnosed as psychotic by three psychiatrists in the 1950's while he was incarcerated at the Georgia State Prison; (3) in 1956, Agan was transferred to Milledgeville State Hospital in Georgia for psychiatric examination and treatment; (4) while at Milledgeville, Agan received eighty-one electric shock treatments—standard procedure at the time for a

person with a psychotic illness; (5) one Milledgeville psychiatrist diagnosed Agan as a low-grade psychopathic personality bordering on high grade mental deficiency while another doctor at Milledgeville diagnosed Agan as having psychoneurosis anxiety reaction with psychotic episodes.

In addition, had Stinson or Futch reviewed Agan's Florida State Prison medical records, they would have discovered that in 1975, Dr. Britton evaluated Agan as an antisocial personality with a history of drug abuse and residual type schizophrenia. The records would also have revealed that between 1975 and November, 1980, Agan was continuously treated with one or more of the following psychotropic drugs: (1) Thorazine—a tranquilizer; (2) Mellaril—a tranquilizer; (3) Prolixin—an intravenous tranquilizer; (4) Haldol—an extremely potent tranquilizer; and (5) Sinequan—an antidepressant.

In sum, both Stinson and Futch stated that had either of them had any indication as to the extent of Agan's mental history, they would have questioned Agan's competency to enter a plea.

### L.E. Turner's Report and File

Prison investigator L.E. Turner prepared a report and compiled a file during his investigation of the DeWitt murder. However, the file was not discovered until some eight (8) years later. Thus, none of the attorneys involved in the case, Stinson, Futch, or James Elwell ("Elwell")[5] ever saw this material prior to the plea or sentencing proceedings. Elwell later stated that, as a matter of personal practice, he would have disclosed such information to the defense had it been know to him at the time.[6]

Turner's file contained the following: (1) a September 9, 1980 letter from DeWitt to Carl Frye, his stepfather, asking for $100.00 to pay alleged extortionist inmates Michael

---

**5.** James Elwell was the lead prosecutor in Agan's case. Elwell, now a judge, offered testimony to the District Court regarding his involvement in the proceedings.

**6.** Elwell did present exculpatory evidence on one occasion. At the sentencing hearing, he stated that the prison officials found two knives in the

area of the murder and submitted them to the Florida Department of Criminal Law Enforcement Laboratory. Elwell said that the weapon that Agan initially identified as the murder weapon was *not* the weapon that came back from the lab with DeWitt's blood type and group. Plaintiff's Exhibit 6—2—28–29.

Gross and Lawrence Cormack; (2) a September 15, 1980 letter from DeWitt to Cindy Pelligrino about two unidentified white men who threatened to stab DeWitt unless they were paid; (3) a note from Frye to Richard Dugger regarding the September 9, 1980 letter Frye had received; (4) a September 28, 1980 letter from Pelligrino regarding the events immediately preceding DeWitt's murder; and (5) Turner's own field notes that identify Gross and Cormack as suspects, suggest a possible eyewitness to the murder, and contain information confirming the facts and circumstances contained in DeWitt's letters to Pelligrino and Frye.

Stinson stated that had he known of the contents of the file, he would have interviewed inmates, spoken to Pelligrino and Frye [7] and further developed the theory that persons other than Agan may have been responsible for the murder. Furthermore, had either attorney known of the existence of Turner's report which contained potentially exculpatory information, each testified that they would have conducted an additional investigation and brought the matter to the attention of the court and the prosecution.

### The Grand Jury and Sentencing Proceedings

The petitioner confessed to a grand jury and explained that he plead guilty in hopes of avoiding the death penalty. However, while in front of the grand jury, the petitioner made a number of statements which were wholly inconsistent with his professed strategy of avoiding the death penalty. Specifically, he stated:

(1) if he got a life sentence he intended to return to prison to kill DeWitt's partner by torturing him;

(2) he thought about killing DeWitt all of the time and wished he could bring him back and kill him by peeling the skin off of his body so DeWitt would suffer more;

(3) he did not intend to kill DeWitt so quickly but actually wanted to paralyze him so he could torture him;

(4) he knew that the knife would be slick from blood so he wrapped an ace bandage around the knife so he could "work on [DeWitt] a little bit" before he killed him.

Plaintiff's Exhibit 6—1.

In addition to the above statements, the petitioner *repeatedly* said that he was aware that he could receive the death penalty for the crime, but was sure that he would not. The juxtaposition of the statements admitting guilt to avoid execution and those evidencing Agan's desire to kill DeWitt and his partner through torture leaves this Court questioning the petitioner's understanding of the implications of his actions.

7. Cindy Pelligrino was an acquaintance of DeWitt's to whom he sent a letter dated September 15, 1980 which states, in relevant part:

> ... I'm in trouble! On Saturday, Sept. 6, while I was lying on my bunk reading my racing forms, two white men threw down on me with knives. They wanted money. I don't—or didn't have any money. To make a long story short, I did some fast talking. So here it is 9/15 and I still haven't done anything. Neither have I given any money nor have I destroyed one of the extortionists. Unfortunately, I have only 3 alternatives: check-in (jail) or pay the $100.00 they desire. My 3rd course of action is to attack! ... There's no doubt in my mind that the aggressors will stick me if I don't pay their request. Hell of a place, isn't it?

Plaintiff's Exhibit 10.

In addition, DeWitt sent Pelligrino another letter dated September 17, 1980 in which he wrote "Well, I'm still alive and well. I still haven't taken care of my little problem I told you about Monday. They want money!" Plaintiff's Exhibit 11.

Carl Frye was DeWitt's step-father to whom DeWitt wrote on September 9, 1980. The letter states, in relevant part:

> ... Since I don't wish to hurt anyone this close to our ballgame, and I cannot see hiding on "max," the best solution I can assume will be to go ahead and pay the two desperadoes. If, after they've spent their money they try to do it again, I'll have to take a different path. For the time being, I want to get the burden off my back, so, if you don't mind, please send 2 money orders, one to Lawrence Cormack # 048866, and one to Michael R. Gross # 072141—$50.00 each. Enclose one sentence in each letter, saying, "enclosed is $50.00 to cover your expenses." Sign each with the letter "D." ... Carl, believe me, if I thought there was another way around this problem, aside from extreme violence, I would never ask you to help, but there isn't! It's imperative that I pay the extortion [sic] at your earliest convenience.

Plaintiff's Exhibit 9.

Following the grand jury proceeding, Agan appeared in the Bradford County Circuit Court for sentencing. His comments and behavior were consistent with that during the grand jury proceedings but again wholly *inconsistent* with his professed strategy of entering a guilty plea to avoid the death penalty:

> THE COURT: I believe that you did testify before the Grand Jury and admitted guilt previously, according to the transcript.
>
> THE DEFENDANT: Yes, sir. Like I said in there, and I will say it again, I just hate that he is dead. I just wish I could bring him back so that I could make him suffer a little more.
>
> THE COURT: You didn't think much of him, did you?
>
> THE DEFENDANT: No, sir, and I don't think nothing of his partner. This is why I am pleading guilty so I can get a life sentence so that I can get back and get him.
>
> .    .    .    .    .    .
>
> THE COURT: Otherwise stated, you are tendering this plea of guilty is [sic] freely and voluntarily?
>
> THE DEFENDANT: Yes, sir, with one exception. May I say something?
>
> THE COURT: Yes, sir.
>
> THE DEFENDANT: The reason why I am pleading guilty is that I figure I can beat the chair. If I go to the jury, I know I am going to get the chair and, so, I plead guilty.
>
> I know that nine times out of ten that Your Honor, or whichever Honor sits on the bench, they are not going to give a chair on a guilty plea. That is why I am pleading guilty.
>
> .    .    .    .    .    .
>
> THE COURT: Do you understand that you stand to receive the electric chair?
>
> THE DEFENDANT: Yes, sir.

> THE COURT: And from what you have said, you are admitting that you will not receive it if you plead to it?
>
> THE DEFENDANT: Yes, sir.

Plaintiff's Exhibit 6—2.

As a result of the above proceedings, Agan was sentenced to death.

## III. DISCUSSION

■ We review the District Court's factual findings under the clearly erroneous standard. *Amadeo v. Zant*, 486 U.S. 214, 223, 108 S.Ct. 1771, 1777, 100 L.Ed.2d 249 (1987) (holding that " '[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.' "). *Id., citing Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Because a District Court order granting or denying a habeas petition alleging ineffective assistance is a mixed question of law and fact, we review the same *de novo*. *Nelson v. Nagle*, 995 F.2d 1549, 1554 (11th Cir.1993); *Yeck v. Goodwin*, 985 F.2d 538, 540 (11th Cir.1993).

### *Ineffective Assistance of Counsel*

■ In order for the District Court to properly issue the writ on the basis of ineffective assistance of counsel, the petitioner must show that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2065, 2068, 80 L.Ed.2d 674 (1984). Furthermore, the *Strickland* test applies with equal force to challenges against guilty pleas based on the ineffective assistance of counsel. *Hill v. Lockhart*, 474 U.S. 52, 58, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985).

■ In an examination of the first prong of the *Strickland* test, we turn to the law of this Circuit to determine if Futch acted in an objectively reasonable manner.[8] It is true

---

8. Agan's first attorney, Stinson, had such limited involvement in the case, both in scope and duration, that the discussion will focus on Futch's preparation and investigation unless otherwise noted.

that "counsel owes a lesser duty to a client who pleads guilty than to one who decides to go to trial ..." however, counsel must still make an independent examination of the facts and circumstances and offer an informed opinion to the accused as to the best course to follow. *Wofford v. Wainwright,* 748 F.2d 1505, 1508 (11th Cir.1984).

██ As stated at some length in the facts, Futch only spent seven (7) hours conducting any sort of external investigation of the case. Futch failed to contact Stinson in an effort to obtain any material he had compiled up to the date of his withdrawal. Furthermore, Futch failed to interview any prisoners or obtain a copy of investigator Turner's report and file; the contents of which would have created substantial questions as to the identity of the actual perpetrator(s).

██ In addition, counsel has a duty to investigate a client's competency to stand trial or plead guilty. *Futch v. Dugger,* 874 F.2d 1483, 1487 (11th Cir.1989). An attorney cannot blindly follow a client's demand that his competency not be challenged. *Bundy v. Dugger,* 816 F.2d 564, 566–67 n. 2 (11th Cir.), *cert. denied,* 484 U.S. 870, 108 S.Ct. 198, 98 L.Ed.2d 149 (U.S.1987).

Futch never obtained any of Agan's prison medical files or military files which would have raised a "red flag" as to Agan's competency. Futch did not contact any of Agan's family members but rather ended the family history inquiry when Agan expressed an unwillingness to answer questions.

In addition, Futch made no independent inquiry into Agan's psychiatric background. Futch had no idea that Agan was taking several psychotropic medications at the time of the proceedings and relied solely on Agan's statements that he had no history of psychiatric problems. Finally, Futch ended further inquiry regarding Agan's mental fitness when Agan refused to submit to a psychiatric examination. Applying the law of this Circuit to the above shortcomings, we hold that the District Court properly found that the petitioner satisfied the first prong of the *Strickland* test; namely that Futch's rep-

resentation fell below an objective standard of reasonableness.

We turn to the second prong of the *Strickland* test to examine whether there is a reasonable probability that, but for Futch's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. The *Strickland* Court provided substantial guidance regarding the proper analysis of prejudice:

> When a defendant challenges a death sentence ..., the question is whether there is a reasonable probability that, absent the errors, the sentencer—including the appellate court, to the extent that it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.
>
> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, *altering the entire evidentiary picture,* and some will have had an isolated, trivial effect. Moreover, *a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.* Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Strickland,* 466 U.S. at 695–96, 104 S.Ct. at 2068–69 (emphasis added).

This "reasonable probability" of a different result is simply a probability sufficient to undermine confidence in the outcome of the case; a standard less than proof by a preponderance of the evidence. *Id.* at 694, 104

S.Ct. at 2068. When the District Court looked at the entire evidentiary picture, it considered: (1) information about Agan's extensive mental health history; (2) Agan's then-current use of psychotropic medication; (3) his "irrational and bizarre" behavior during the proceedings; (4) substantial facts suggesting Agan's innocence; and (5) the fact that none of the attorneys for the defense or prosecution nor the sentencing Judge were ever apprised of the existence of Turner's file or records of Agan's extensive psychiatric history.

Based on a plenary review of the newly discovered evidence and testimony of the attorneys involved in the case, the District Court found that its confidence in the outcome of the sentencing hearing was sufficiently undermined thus satisfying the second prong of the *Strickland* test. We hold that the District Court's factual findings are not clearly erroneous and find that its "account of the evidence is plausible in light of the record viewed in its entirety...." *Amadeo,* 486 U.S. at 223, 108 S.Ct. at 1777. Furthermore, after our *de novo* review of Agan's ineffective assistance claim, we hold that the District Court properly found that the petitioner satisfied both prongs of the *Strickland* test and properly issued the writ on that basis.

## IV. CONCLUSION

Based on the above discussion, we hold that the District Court's findings and conclusions are amply supported by the record. It properly determined that the writ should issue. Accordingly, we AFFIRM the District Court's order in all respects.

AFFIRMED.