**Fred Berre DOUGLAS, Petitioner–Appellant,**

v.

**Jeanne S. WOODFORD, Warden, of RSWL California State Prison at San Quentin, Respondent–Appellee.**

No. 01–99004.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 11, 2002.

Filed Jan. 24, 2003.

Mark A. Borenstein, Overland & Borenstein, LLP, Los Angeles, California, for the petitioner-appellant.

Pat Zaharopoulos, Office of the Attorney General for the State of California, San Diego, California, for the respondent-appellee.

Before SCHROEDER, Chief Judge, HAWKINS, and W. FLETCHER, Circuit Judges.

## OPINION

MICHAEL DALY HAWKINS, Circuit Judge:

Fred Douglas, a California death row inmate, appeals from the denial of his petition for a writ of habeas corpus. Because we find that Douglas's counsel was constitutionally ineffective in failing to investigate and present significant mitigating evidence to the jury, we grant relief as to the penalty phase, but deny all his other claims.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1984, Douglas was convicted in California state court of the 1982 murders of two teenage girls, Beth Jones and Peggy Krueger. The case against Douglas was

based primarily on the immunized testimony of his accomplice, Richard Hernandez, whose testimony was substantially corroborated by other witnesses.

Douglas was linked to the missing girls by Dana Lee, who testified he had met Douglas about a month before the murders. Douglas had asked if Lee knew of any women who would pose for nude photographs. Lee introduced Douglas to Krueger, who in turn introduced Douglas to Jones. The girls told Lee and their roommate, Terry Allmon, that they planned to pose nude for money. Allmon testified that Jones told her if she wasn't back by noon the next day, "something was wrong." When Jones did not return, Allmon notified the girl's mother.

Hernandez's testimony supplied most of the details about the murders. Hernandez had been working in Douglas's furniture refinishing shop, and was paid in food, beer, lodging and occasional spending money. According to Hernandez, he and Douglas drove Krueger and Jones to the desert near Indio. Douglas told Hernandez to lay a sheet on the ground and prepare drinks for the four of them. An hour later, Douglas instructed the victims to remove their clothing. When Krueger asked to see the money, Douglas showed her a $100 bill. Douglas then instructed Hernandez to tie the victims' feet and hands and retrieved a rifle from his car, telling them "here is the camera." He ordered them to make love to each other and for ten to fifteen minutes paced back and forth shouting orders at the victims.

Douglas cut Krueger on the neck with a razor blade and sucked on the wound for about ten minutes. He then retrieved a beer and told Hernandez the women "just couldn't go back." Douglas instructed the victims to orally copulate him. At this point, Hernandez claims he briefly left the scene. When he returned, he saw Douglas choking Jones. Hernandez said Krueger appeared dead and blood was spurting from her mouth. Hernandez claims he tried to stop Douglas, but Douglas knocked him down and Hernandez was too intoxicated to stop him. After choking Jones, Douglas struck her in the neck with the rifle.

Douglas and Hernandez went to a nearby bar for a drink and then returned to the murder scene. Douglas ordered Hernandez to bury the bodies and left for an hour. When Douglas returned, they dumped the victims' clothing and drove back to Douglas's business, where they burned the victims' identification.

Hernandez and Douglas were questioned by police shortly after the murders. Both gave an alibi Douglas had concocted before the crime about spending the day fishing in Oceanside. The two left for Canada that evening. About six weeks later, they drove to Nevada and changed license plates, then drove to the murder site to check the graves. Toward the end of 1982, the men returned to Canada, and then Douglas left without telling Hernandez where he was going.

The girls' bodies were discovered in 1983. Hernandez had by this time returned to Orange County. Upon learning of the discovery and that there were warrants for their arrest, Hernandez and Douglas fled to Mexico. Douglas left three weeks later, but Hernandez remained for nearly ten months until he was taken into custody by Mexican authorities on different charges. Before speaking to American authorities, Hernandez was beaten by Mexican officers and ultimately confessed to his role in the murders. Douglas was arrested in Las Vegas in February 1984, waived extradition and was returned to California.

At the guilt phase of Douglas's trial, the State corroborated Hernandez's description of events with testimony about a simi-

lar incident with Douglas a few years prior to the crime. Kathy Phillips testified that she was a friend of Hernandez, who often supplied her with drugs and lived next door to Douglas's furniture refinishing shop. Hernandez introduced Phillips to Douglas in 1979. Douglas told her he would pay her if she posed nude for photographs while in bondage. She agreed, and Douglas took her to his shop, tied her hands and ankles, and gagged her mouth. He showed her photos of several other women to indicate how he wanted her to pose. He told her to "look scared," but did not harm her.

Phillips went on to describe how, two weeks later, Douglas asked her if she would assist him in killing young women in the desert while making sex films that included bondage and sadism. Douglas apparently believed having a woman present would make it easier for the victims to trust him. Phillips testified that Douglas told her that his plan was to bury the bodies to eliminate any evidence and that they could make a lot of money selling the films to "people in Las Vegas." Phillips refused to participate in the scheme, but did not go to the police because of her drug habit. Her contact with Douglas ended when she was convicted of burglary and sentenced to jail.

Douglas presented an alibi defense. Douglas's long-time friend, Henry Akers, testified that on the morning of the murders he had spoken to Douglas at the same time Hernandez claimed he and Douglas were driving to the desert with the victims. This story was consistent with the one given by Akers to police at the beginning of their investigation, but was substantially impeached during the prosecution's rebuttal.

Douglas also called an acquaintance of Krueger's who testified she saw what she thought were the victims at a mall a month after the date of the murders. Krueger's boyfriend testified that he believed Krueger had left on the day of the murders to visit friends, and that after Krueger's disappearance he had confronted Lee about a man named "Doug," whom Dana Lee described as having an appearance that differed from Douglas's.

The jury convicted Douglas of first degree murder and found the special circumstance of multiple murder, making him death eligible. At the penalty phase, Julia McGettrick and Vickie Pendleton testified of separate incidents in 1976 in which Douglas forced or frightened them into posing for nude photographs or performing sex acts in the desert. A third woman, Pamela Williams, testified that in 1977 Douglas had picked her up hitchhiking and sought her participation in a plan to make movies involving the torture and killing of young women. Douglas was charged with attempted murder and other crimes arising out of this plan, and, after the jury deadlocked, eventually pled nolo contendere to solicitation to commit a felony.

In mitigation, the defense introduced testimony by Douglas's wife, son, a friend and a neighbor. The witnesses testified generally about Douglas's good character, nonviolent nature, generosity and difficult background as an orphan. The jury returned a verdict of death, and the trial judge confirmed the sentence.

Douglas's convictions and sentence were upheld on direct appeal. He filed for federal habeas relief in 1992. Federal proceedings were stayed while Douglas exhausted several claims in state court. The district court granted an evidentiary hearing on some claims, including Douglas's claim of ineffective assistance of counsel, and then ordered briefing on all the claims in the petition. The district court ultimately denied Douglas's petition in November 2000, but granted a Certificate of Appealability ("COA") as to two issues,

involving ineffective assistance of counsel. Douglas's motion to broaden the COA was granted in part by this court, adding additional claims concerning the admission of Hernandez's testimony, Douglas's competence to stand trial, and improper argument by the State during the penalty phase closing argument.

## STANDARD OF REVIEW

Douglas's federal habeas petition was filed prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Accordingly, pre-AEDPA standards apply to his claims. *Lindh v. Murphy*, 521 U.S. 320, 322–23, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The district court's decision to grant or deny a 28 U.S.C. § 2254 petition is reviewed de novo. *Bean v. Calderon*, 163 F.3d 1073, 1077 (9th Cir.1998). The district court's refusal to hold an evidentiary hearing is reviewed for abuse of discretion. *Caro v. Calderon*, 165 F.3d 1223, 1225–26 (9th Cir.1999).

## DISCUSSION

### I. INEFFECTIVE ASSISTANCE OF COUNSEL

Douglas alleges that his trial counsel was ineffective because he failed to investigate and develop a mental health defense at the guilt phase and because he failed to introduce mental health and social background evidence in mitigation at the penalty phase of the trial. We review Douglas's claim according to the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Douglas must prove that his counsel's performance was deficient and that it prejudiced the outcome of his trial. *Id.* at 689, 694, 104 S.Ct. 2052. "Whether a defendant received ineffective assistance of counsel is a legal question reviewed de novo." *Smith v. Ylst*, 826 F.2d 872, 875 (9th Cir.1987).

### A. *Guilt Phase—Mental Health Investigation*

■ Trial counsel has a duty to investigate a defendant's mental state if there is evidence to suggest that the defendant is impaired. *See Bean*, 163 F.3d at 1078. In this case, Douglas's trial counsel, George Peters, recognized that a psychiatric defense might be an option. Early in the case, he had a psychiatrist, Dr. Sharma, and a psychologist, Dr. Rogers, appointed to help. At the time, Douglas was experiencing severe claustrophobia in his jail cell, a problem apparently related to having been locked in a closet by abusive adoptive parents as a child. Because Douglas was focused on his claustrophobia, Peters had a difficult time getting him to concentrate on his defense, and initially engaged the mental health experts to assist in this problem, in particular, by asking them to try to get an individual cell for Douglas.

Although Peters directed the experts to focus primarily on the claustrophobia issue, he testified that he also instructed them to see if there was anything of a psychological nature that could be useful in the defense. Each doctor performed some brief interviews and testing, and found no indications of any major mental disorders. Dr. Rogers did suggest that additional testing could be done, and Peters requested and received $35,000 for additional mental health testing.

■ Further tests, however, were never performed. Douglas received a private cell at the jail and, as the district court found, then refused any further cooperation in mental health testing. This finding is not clearly erroneous. There was substantial testimony from Peters that although he broached the subject with Douglas several times, Douglas was adamant that he did not want any psychological issues introduced at trial, that he was inno-

cent and that he wanted to use an alibi defense. Douglas's attitude was corroborated by one of the investigators Peters had hired to help with the case.[1] While Douglas was willing initially to consult with the doctors, there is no indication he was willing to do so *after* receiving his own cell. Strikingly absent is any testimony by Douglas to the contrary. On these facts, we cannot say the district court clearly erred when it determined that Douglas would not submit to further psychological testing. Therefore, Peters did not err by failing to obtain further testing, as Peters could not secure such testing without his client's cooperation.[2]

██ This conclusion does not, however, as the State would have it, absolve Peters of all responsibility for further investigation into a mental health defense. Indeed, as we recently explained, "if a client forecloses certain avenues of investigation, it arguably becomes even more incumbent upon trial counsel to seek out and find alternative sources of information and evidence, especially in the context of a capital murder trial." *Silva v. Woodford,* 279 F.3d 825, 847 (9th Cir.), *cert. denied,* ─ U.S. ─, 123 S.Ct. 342, 154 L.Ed.2d 249 (2002); *see also Agan v. Singletary,* 12 F.3d 1012, 1018 (11th Cir.1994) ("An attorney cannot blindly follow a client's demand that his [mental state] not be challenged ... and end[ ] further inquiry regarding [the defendant's] mental fitness when [the defendant] refused to submit to psychiatric examination.").

In this case, as it turns out, there was a significant alternative source of informa-tion that was readily discoverable. Although Peters ordered and reviewed the file pertaining to Douglas's 1977 offense, he failed to discover an order contained in that file directing Dr. Louis Broussard to administer a psychological examination to Douglas. Based on his 1977 interview and testing with Douglas, Dr. Broussard concluded that Douglas was suffering from "serious and outstanding mental illness and possible organic impairment." He found that Douglas was confused, his thought processes chaotic, and that he suffered from severe paranoia. Dr. Broussard believed his test results indicated "some level of pre-existing neurological deficit," which may have interacted with brain damage later in life stemming from Douglas's chronic alcoholism, constant exposure to toxic solvents in connection with his furniture refinishing business, and a serious head injury sustained in an automobile accident in 1967. Based on his observations, Dr. Broussard had informed Douglas's attorney in 1977 of his opinion that: (1) Douglas might not be competent to stand trial; and (2) it was reasonably certain Douglas did not have the capacity to plan and execute the actions with which he had been charged.

Peters admits that he learned of Dr. Broussard for the first time during the habeas proceedings. Peters also testified that he "would have loved to have" had the mental health information Dr. Broussard developed for use during the trial. Even the State concedes that it was professional error not to discover Dr. Broussard.[3] We therefore agree with Douglas that Peters's

---

1. Peters had two investigators appointed who were very experienced with complex criminal cases. One investigator died prior to Douglas's habeas proceeding.

2. Because of this conclusion, we do not consider for prejudice purposes the testimony Douglas introduced from various experts at the evidentiary hearing, but only the informa-tion Peters could have obtained without Douglas's cooperation.

3. Dr. Broussard maintained an office in Orange County at the time of Douglas's trial and his phone number was listed in the phone book. Thus, had Peters noticed the order in the 1977 file, it would have been easy to contact Dr. Broussard.

investigation of his mental health was deficient.

### B. *Guilt Phase Prejudice*

■ Notwithstanding the inadequacy of Peters's mental health investigation, Douglas cannot succeed on his claim unless he demonstrates a "reasonable probability" that the outcome of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. With respect to the guilt phase, Douglas has not borne this burden.

To establish a legal defense to first degree murder, Douglas would have had to prove that he lacked the ability to premeditate and deliberate. At the evidentiary hearing, Dr. Broussard testified that Douglas's mental state in 1977 was like that of a long-term institutionalized patient and that Douglas would be unable to function in society. Dr. Broussard's opinion on Douglas's ability to premeditate was questioned by the district court, which gave it "little weight" because Dr. Broussard's impressions of Douglas's abilities were contradicted by objective evidence that Douglas had been running his own furniture refinishing shop and two bars, things Dr. Broussard testified Douglas simply could not be doing.

In contrast, the State's evidence overwhelmingly pointed to premeditation and deliberation. Phillips testified that Douglas had taken photographs of her in bondage and asked her to participate in a murder plot two years before the murders. Lee testified that Douglas had asked him if he knew of any young girls who would be photographed nude. Hernandez testified that Douglas had picked out a remote spot in the desert ahead of time, created an alibi for them in advance (and then gave police that story when questioned), and that Douglas packed a rope, a gun and a shovel for the trip to the desert. In light of this substantial evidence, we conclude

that it is not reasonably probable that the jury would have accepted Dr. Broussard's testimony that Douglas lacked the ability to premeditate and deliberate the murders. We therefore agree with the district court that Douglas did not establish prejudice at the guilt phase.

### C. *Penalty Phase—Social Background Investigation*

In addition to the inadequate mental health investigation, Douglas also contends that Peters conducted an inadequate investigation into his social history and failed to prepare witnesses adequately for the penalty phase of the trial. Douglas again was less than helpful. When asked about his childhood, Douglas reported that his parents were dead and that his past was a "blank." According to one investigator, Douglas would not provide the names of relatives or friends regarding childhood abuse. The investigators thus pursued other avenues, including interviewing Douglas's wife, son, friends and neighbors. Peters spent virtually no time preparing these witnesses for their testimony at the penalty phase. Douglas's wife asserts that she did not even know she would be testifying until the night before the penalty phase began.

The mitigation evidence presented was minimal. Two witnesses testified that Douglas had an aversion to the sight of blood and several testified as to his nonviolent nature, in an apparent attempt to focus on "lingering doubt" of whether Hernandez's story was completely true. Against Douglas's wishes, Peters did introduce some sociological history. His family members testified in very general terms that Douglas had been orphaned and had a difficult childhood, running away from home at fifteen to join the Marines. They also indicated that Douglas was very poor growing up and always kept large quanti-

ties of food in his home, apparently as a result of this childhood deprivation.

In his closing, Peters argued that these factors may have created a "demon" within Douglas that had finally surfaced after years and years of a normal life. Peters attested during the habeas proceedings that at the time he was making the closing argument, he was afraid Douglas was going to "leap out and grab me around the throat" for disregarding his wishes.

Douglas contends here that much more information should have been discovered and presented at the penalty phase. At the evidentiary hearing, he presented detailed testimony of a difficult childhood. Douglas was abandoned as a child and raised by foster parents, including an abusive alcoholic foster father who locked him in a closet for long periods of time. He grew up in an extremely poor Chicago neighborhood where children had to scavenge for food in garbage cans and often ate lard or ketchup sandwiches. After running away at the age of fifteen to join the Marines, Douglas was arrested and put in a Florida jail where he was beaten and gang-raped by other inmates.

Additional character evidence was also available. In the Marines, Douglas earned a number of medals and commendations and also helped rescue two drowning sailors. Another witness testified that Douglas had been very helpful to her during her pregnancy and marital difficulties.

Finally, Douglas presented additional evidence of possible brain damage. After the military, Douglas began working in furniture refinishing and was exposed to toxic solvents daily. In 1967, Douglas was involved in a serious auto accident and suffered a concussion and damage to his left temporal lobe. He also consumed a great deal of alcohol on a daily basis from 1966 to 1977.

 We first consider whether Peters's investigation of Douglas's social his-

tory was inadequate. Douglas was not forthcoming with useful information, but, as noted above, this does not excuse counsel's obligation to obtain mitigating evidence from other sources. *Silva*, 279 F.3d at 846–47. When it comes to the penalty phase of a capital trial, "[i]t is imperative that all relevant mitigation information be unearthed for consideration." *Caro*, 165 F.3d at 1227. This duty to investigate is not limitless, however; "it does not necessarily require that every conceivable witness be interviewed." *Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir.1995). For example, in *Babbitt v. Calderon*, we found that counsel was not ineffective for failing to uncover a family history of mental illness where counsel's investigators spoke with family members and friends who might have had such information, but none of them reported any history of illness. 151 F.3d 1170, 1174 (9th Cir.1998).

"[C]ounsel is not deficient for failing to find mitigating evidence if, after a reasonable investigation, nothing has put the counsel on notice of the existence of that evidence." *Id.* (internal quotation and citation omitted). In this case, however, the initial investigation *did* put counsel on notice that Douglas had a particularly difficult childhood, yet there was no attempt to contact persons who might have had more detailed information about Douglas's past. Peters's failure to prepare the witnesses adequately for testimony at the penalty phase also meant that the testimony that was introduced was less than compelling. Indeed, even though Peters knew that Douglas had spent a great deal of time locked in a closet, a factor which contributed to his severe claustrophobia, Peters did not elicit any testimony regarding this fact from Douglas's family.

It was also easy to ascertain that Douglas's line of work exposed him to toxic solvents, yet Peters did not investigate the

effects of this exposure or inform the mental health experts who examined Douglas of this fact. *See Caro v. Woodford,* 280 F.3d 1247, 1254–56 (9th Cir.), *cert. denied* —— U.S. ——, 122 S.Ct. 2645, 153 L.Ed.2d 823 (2002) (finding counsel ineffective for failing to investigate effects of long term exposure to neurotoxicants). Evidence regarding a serious head injury in a 1967 automobile accident could have been detected from medical records or from Dr. Broussard (had he been discovered). In sum, although Peters did perform some investigation, it was constitutionally inadequate. The information Peters did obtain about Douglas's troubled childhood revealed the need to dig deeper, and he did not adequately prepare the witnesses in order to present the material he did gather to the jury in a sufficiently detailed and sympathetic manner. We therefore conclude that Peters's investigation and presentation of social history at the penalty stage was deficient.

### D. *Penalty Phase—Prejudice*

■ Having found that Peters did not conduct an adequate investigation into Douglas's mental health or social background, we consider whether it is reasonably probable that this additional evidence could have affected the outcome of the penalty phase. As a preliminary matter, we recognize that in some recent cases when a defendant has insisted that mitigating evidence not be presented, we have analyzed prejudice in terms of whether the additional evidence would have changed the defendant's mind. *See, e.g., Hayes v. Woodford,* 301 F.3d 1054, 1070 (9th Cir. 2002); *Landrigan v. Stewart,* 272 F.3d 1221, 1228 (9th Cir.2001). We do not believe such a test is applicable in the case here, in which counsel actually disregarded his client's wishes and did put on what mitigating evidence he had unearthed. Thus, in this case, it was not the client's desires which impeded Peters's efforts, but

rather, Peters's failure to uncover the additional evidence that creates the problem.

We also note that even when we have placed emphasis on the client's desires, we have required that the client make an "informed and knowing" decision not to present mitigating evidence. *Jeffries v. Blodgett,* 5 F.3d 1180, 1193 (9th Cir.1993); *see also Silva,* 279 F.3d at 847 (holding that counsel has duty to "try to educate or dissuade" the defendant about the consequences of actions). It is, of course, difficult for an attorney to advise a client of the prospects of success or the potential consequences of failing to present mitigating evidence when the attorney does not know that such evidence exists. *See Landrigan,* 272 F.3d at 1228 ("[I]f the investigation had been more thorough, [defendant] would have had more information from which he could make an intelligent decision about whether he wanted some mitigating evidence presented.").

■ Moreover, we have been careful to note that although the client's desires are not to be ignored altogether, it may be inappropriate for counsel to acquiesce to the client's demands. As we recently held in *Williams v. Woodford,* counsel "cannot be faulted for deferring to the defendant's desire to forgo presentation of mitigating evidence *when the defendant's wish coincides with counsel's reasonable professional judgment that no mitigating evidence be introduced.*" 306 F.3d 665, 720 (9th Cir.2002) (emphasis added); *see also Campbell v. Kincheloe,* 829 F.2d 1453, 1462 n. 5 (9th Cir.1987) (holding counsel not ineffective for adhering to a client's desire not to present evidence when counsel had legitimate strategic reasons for not presenting the evidence). "[C]ounsel must, at a minimum, conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client." *Sanders v. Ratelle,* 21 F.3d 1446,

1456–57 (9th Cir.1994) (emphasis omitted); *see also Jennings v. Woodford,* 290 F.3d 1006, 1014 (9th Cir.2002) ("[A]ttorneys have considerable latitude to make strategic decisions ... *once they have gathered sufficient evidence upon which to base their tactical choices.*") (emphasis in original). Instead, as in *Silva,* Peters "could not make a reasoned tactical decision about the trial precisely because 'counsel did not even know what evidence was available.'" 279 F.3d at 847 (quoting *Deutscher v. Whitley,* 884 F.2d 1152, 1160 (9th Cir.1989)). As a result, neither Douglas nor Peters made a fully informed decision not to present the evidence to the jury.[4]

██ Turning to a more traditional prejudice analysis, we consider whether there is a reasonable probability that the additional evidence that Peters should have discovered would have altered the outcome of the penalty phase. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Evidence regarding social background and mental health is significant, as there is a "belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Boyde v. California,* 494 U.S. 370, 382, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) (internal quotation marks and emphasis omitted).

The available mitigating evidence that could have been introduced in Douglas's trial was precisely the type of evidence that we have found critical for a jury to consider when deciding whether to impose a death sentence. *Ainsworth v. Woodford,* 268 F.3d 868, 875 (9th Cir.2001) (holding that available evidence would have provided the jury insight into the defendant's troubled childhood, history of substance abuse and mental and emotional problems). Although Peters introduced some of Douglas's social history, he did so in a cursory manner that was not particularly useful or compelling. *See id.* at 874 ("While it is true that the testimony touched upon general areas of mitigation, counsel's cursory examination of the witnesses failed to adduce any substantive evidence in mitigation."). Peters's argument that Douglas's life had created a "demon" within him lacked force without some expert testimony to back it up. *See Caro,* 165 F.3d at 1227 (holding that the jury did not "have the benefit of expert testimony to explain the ramifications of these experiences on[defendant's] behavior").

Although we did not find that Peters's failure to discover Dr. Broussard impacted the outcome of the guilt phase, the same cannot be said of the penalty phase. Even if the testimony were not enough to negate an element of underlying offense, it could have invoked sympathy from at least one member of the jury at the penalty phase, particularly when considered in connection with additional sociological history evidence discussed above. *See Hendricks,* 70 F.3d at 1044 (holding that mental health evidence could be mitigating at the penalty phase "even though it is insufficient to establish a legal defense to conviction in the guilt phase"). Douglas's alibi defense had failed; the jury had obviously accepted Hernandez's testimony and, particularly in light of the additional penalty phase testimony introduced by the prosecution, "lingering doubt" was not a viable option. *Cf. Williams,* 306 F.3d at 715 (holding counsel was not ineffective for failing to present mental health evidence where lin-

---

4. This case also amply illustrates the need for counsel to discover and independently evaluate the potential evidence, as a person with a mental disorder may be reluctant to recognize his own problems. *See Bundy v. Dugger,* 816 F.2d 564, 566–67 n. 2 (11th Cir.1987).

gering doubt was a viable strategy). Accordingly, there was nothing to lose by presenting Dr. Broussard's testimony about Douglas's mental health.

Dr. Broussard could have also presented significant testimony regarding Douglas's performance on a variety of psychological tests which, in Dr. Broussard's opinion, revealed a "serious and outstanding mental illness." Even without conducting a contemporaneous interview of Douglas, Dr. Broussard opined during the habeas proceedings "to a reasonable degree of scientific certainty" that the results of a 1983 or 1984 examination "would have also revealed significant mental illness and dysfunction." Dr. Broussard could have also provided a valuable explanation of other mitigating evidence by explaining how the effects of the solvents and the automobile accident may have exacerbated Douglas's pre-existing neurological deficit.

The gruesome nature of the killing did not necessarily mean the death penalty was unavoidable. *See Smith v. Stewart,* 189 F.3d 1004, 1013 (9th Cir.1999) ("[T]he horrific nature of the crimes involved here does not cause us to find an absence of prejudice."); *Hendricks,* 70 F.3d at 1044 (holding that despite the substantial evidence of aggravation, failure to present mitigating evidence was prejudicial). The jury did not hear a substantial amount of Douglas's social history and there was a total absence of evidence regarding Douglas's mental problems. The jury's failure to consider this compelling evidence "undermine[s][our] confidence in the outcome" of Douglas's penalty phase hearing. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Douglas has thus established that Peters's deficient performance was prejudicial and the writ should be granted with respect to Douglas's sentence. Because of our decision on this issue, we do not reach the additional claims affecting the penalty phase of his trial, and consider only Doug-

las's remaining claims affecting the guilt phase.

## II. HERNANDEZ'S TESTIMONY

### A. *Facts*

Hernandez was initially arrested in Mexico in 1984. Mexican officials informed the Anaheim Police Department of the arrest, and several California officers traveled to Mexico to bring Hernandez back. The officers informed the local Mexican police of the murders, showed them the arrest warrant and provided them some photographs. The Mexican officers allowed as how they intended to question Hernandez and borrowed a tape recorder from the Americans, but the American officers were not invited to attend the interrogation. During the interrogation that followed, Hernandez claims he was beaten for fifteen or twenty minutes, but still did not talk. The police then stopped the questioning, but informed Hernandez he could expect worse treatment that evening. They returned later and told Hernandez they were going to "take him out to the beach." Hernandez construed this to mean that he would be taken to the beach and killed. Fearing for his life, Hernandez gave a full confession. His statement was typed and signed, and he was told it would not be given to the California officials.

Mexican police then released Hernandez to California authorities, giving them a copy of the statement. Hernandez was escorted across the border and officially arrested. Before his arraignment, he was interviewed at the police station by Deputy District Attorney Rackacaus, who did not give Hernandez a *Miranda* warning. Rackacaus told Hernandez their discussion was "off the record," that Hernandez was in "serious trouble" and that he wanted to know Hernandez's story to see if he could be used as a witness against Douglas.

Hernandez agreed to tell his story, though he did not want it taped.

During the interview, Rackacaus did not mention the Mexican confession. Although Hernandez says he suspected the American police were given the statement, he did not know if this were true. During the interview, Hernandez's counsel arrived at the station, and although Hernandez was informed of this fact, he indicated he would finish giving his statement before speaking to counsel. Hernandez subsequently testified that his statements to Rackacaus were made freely and voluntarily. By his own account, any remaining threat of beating disappeared once he crossed the border, testifying that he "knew [he] wasn't going to get beat up or forced to say anything [he] didn't want to."

A few weeks after the interview, following negotiations between the prosecution and Hernandez's counsel, Hernandez was granted full immunity in exchange for his testimony against Douglas. No conditions were placed on the grant and he was not required to testify in conformity with his earlier representations. He was, however, informed that he could be prosecuted for perjury if he testified untruthfully.

B. *Due Process Violation*

■ Douglas contends that Hernandez's trial testimony violated his due process rights because Hernandez's testimony was involuntary as a direct product of the coerced Mexican confession and because American authorities aided and abetted the procuring of the confession and then exploited its results. In general, Douglas does not have standing to challenge a vio-

lation of Hernandez's rights; however, illegally obtained confessions may be less reliable than voluntary ones, and thus using a coerced confession at another's trial can violate due process. *See Clanton v. Cooper,* 129 F.3d 1147, 1157–58 (10th Cir. 1997); *United States v. Mattison,* 437 F.2d 84, 85 (9th Cir.1970). Because the confessions themselves were not introduced at Douglas's trial, however, he must show that Hernandez's *trial* testimony was involuntary. *Mattison,* 437 F.2d at 85.

■ Douglas essentially argues that the "taint" of the beatings in Mexico carried over to trial, relying on a number of cases in which the government sought to introduce purportedly voluntary confessions that followed an initial confession obtained in violation of an accused's constitutional rights. *See, e.g., United States v. Jenkins,* 938 F.2d 934, 941 (9th Cir.1991) (holding that amount of time elapsed and "purpose and flagrancy" of misconduct are considerations in whether taint of coerced confession has dissipated).[5] The district court correctly recognized that our decision in *Mattison* is more analogous, as it actually involved a witness's live trial testimony after an earlier involuntary confession by that witness. In *Mattison,* as here, the defendant argued that the witness's trial testimony was so tainted by the illegal confession that it rendered the trial fundamentally unfair. 437 F.2d at 85. We disagreed, stating that "[B]y the time of trial, the psychologically coercive atmosphere of that interrogation must surely have dissipated. There is no indication that [the witness] was told at any time by anyone what he should say on the witness

5. As part of this overall claim, Douglas also argues that the role of the United States officers in the Mexican confession contributed to the involuntariness of Hernandez's trial testimony. The record, however, reflects that the alleged participation in the coerced Mexican confession appears to be somewhat limited: the American officers showed the Mexican officers photographs and an affidavit in support of the warrant for Hernandez's arrest, accompanied them on a warrantless search of Hernandez's local residence and supplied a tape recorder to the Mexican officials upon request.

stand." *Id.* We also noted that, in contrast to introducing an out-of-court statement, the witness's testimony was subject to cross-examination and the jury could observe demeanor and gauge credibility and decide what weight to afford the testimony. *Id.* In this case, Hernandez himself acknowledged that the coercive nature of the Mexican interrogation changed once he crossed the border, where he knew he would not be beaten or told what to say. The American authorities did not utilize the Mexican confession in any way against Hernandez, nor was it introduced at Douglas's trial. *See id.* Having negotiated complete immunity, the prosecution had nothing to hold over Hernandez at the time he testified. He was not told what to say at Douglas's trial, other than to "tell the truth." He was cross-examined and the jury had the opportunity to observe his credibility.

While true that the "purpose and flagrancy" of the misconduct is to be considered relevant in determining whether the taint of an involuntary confession has dissipated, it is hard to say that the American officers' "participation" in the Mexican confession was particularly flagrant, and it did not make it any more likely that Hernandez's later trial testimony was involuntary. On these facts and in line with *Mattison,* the district court correctly concluded that even though the earlier confessions were involuntary or in violation of Hernandez's constitutional rights, his testimony at Douglas's trial was not coerced and did not violate Douglas's due process rights.

C. *Failure To Disclose Mexican Reports*

█ In a somewhat related claim, Douglas alleges that the prosecution failed to provide the defense with reports from Mexican authorities concerning their interrogations of Hernandez. Douglas claims that the reports would have established a link between American officials and the Mexican interrogation, and that the district court abused its discretion by denying an evidentiary hearing on this matter.

The State, on the other hand, claims that it never had the interrogation tape or signed confession, and that Detective Martinez was given only a typed report in Spanish. (Martinez testified at the state court hearing that Mexican authorities did not give them the tape, but gave them a typed report instead.) The State also asserts that this was obviously turned over to the defense, because Peters cross-examined Hernandez in detail about his statements to the Mexican police and their interrogation methods.

An evidentiary hearing is required where "the petitioner's allegations, if proved, would establish the right to relief." *Silva,* 279 F.3d at 833 (internal quotation marks omitted). In this case, Douglas has not alleged any additional facts that would be borne out by disclosure of the tapes. He contends only generally that the tape and reports would have shown the United States officers' "involvement" in the Mexican interrogation. He does not explain how the information would be materially different from the information developed in state court. The American officers were questioned at the pre-trial state court hearing regarding their role in the Mexican interrogation. Douglas's counsel also cross-examined Hernandez in front of the jury about the Mexican confession. Even assuming the state had the reports (which is contradicted by the record), Douglas cannot establish that he was prejudiced by the failure to produce these reports.

### III. COMPETENCY

Douglas contends that the district court abused its discretion by failing to hold an evidentiary hearing with respect to his competency at the time of his trial in 1984

and that the facts were not sufficiently developed for the court to rule on this claim.

 To be competent to stand trial, a defendant must demonstrate an ability "to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him." *Godinez v. Moran,* 509 U.S. 389, 396, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) (internal quotations and citation omitted). In order to be entitled to an evidentiary hearing on a claim of actual incompetency, the defendant must raise a "real and substantial" doubt as to his competency, even if those facts were not presented to the trial court. *Boag v. Raines,* 769 F.2d 1341, 1343 (9th Cir.1985).

 Douglas's incompetency claim is based principally on the 1977 evaluation by Dr. Broussard, who had determined Douglas was not competent to stand trial in 1977, and the opinion of Dr. Rosenberg, who examined Douglas in 1997. Both doctors testified that they believed Douglas was also incompetent at the time of the trial in 1984. The district court found that these opinions did not suffice to raise a "real and substantial" doubt as to Douglas's competence in 1984 in light of other contemporaneous and objective indications of competence.

Specifically, Douglas's trial attorney testified that he spent a considerable amount of time with Douglas preparing for trial and that he had absolutely no doubt that Douglas understood the charges against him and was able to assist in his defense. Dr. Rogers, the psychologist who examined Douglas in 1984, was not specifically requested to prepare a formal opinion on competence, but verbally discussed Douglas's condition with Peters and told him that she believed Douglas was competent. Douglas did not exhibit any strange behavior in the courtroom, nor did the prosecu-

tor or trial judge express any concerns about his competence. *See Hernandez v. Ylst,* 930 F.2d 714, 718 (9th Cir.1991)(finding it significant that neither trial judge, government counsel or defense attorney questioned defendant's competence).

Finally, perhaps the most convincing evidence of Douglas's competence in 1984 is the clerk's transcript of the hearing on Douglas's motion for substitute counsel pursuant to *People v. Marsden,* 2 Cal.3d 118, 84 Cal.Rptr. 156, 465 P.2d 44 (1970). Following the jury verdict at the guilt phase, Douglas filed a declaration in support of a *Marsden* hearing, complaining of various disagreements with Peters during the trial. The trial court held a hearing and discussed the complaints with both Peters and Douglas. Douglas was coherent, responsive and quite articulate throughout the proceeding. The transcript makes it quite clear that Douglas understood the charges against him, including the significance of the upcoming penalty phase and that he had paid close attention throughout the guilt phase. Like the district court, we find this transcript to be strong evidence that Douglas was competent at the time of his trial in 1984.

The district court correctly concluded that Douglas did not raise a "real and substantial" question about his competence to stand trial and was not entitled to habeas relief on this claim.

## CONCLUSION

The district court properly denied the writ with respect to Douglas's guilt phase claims regarding competence, ineffective assistance of counsel, and the admission of the Hernandez testimony. Because the failure to adequately investigate Douglas's social history and mental health was prejudicial during the penalty phase, we remand the case to the district court with instructions to grant the petition for a writ of

habeas corpus unless the State within a reasonable period of time either grants a new penalty phase trial or vacates the sentence and imposes a lesser sentence consistent with law.

AFFIRMED IN PART; REVERSED IN PART; PETITION GRANTED AS TO SENTENCE AND REMANDED TO DISTRICT COURT WITH INSTRUCTIONS.